**COMMONWEALTH OIL REFINING COMPANY, INC., Plaintiff,**

v.

**TESORO PETROLEUM CORPORATION et al., Defendants.**

**No. 75 Civ. 1949 (JMC).**

United States District Court,
S. D. New York.

April 30, 1975.

Proskauer Rose Goetz & Mendelsohn, New York City (David I. Goldblatt, Stephen R. Kaye, George M. Shapiro, Klaus Eppler, Morton M. Maneker, Howard N. Lefkowitz, New York City, of counsel), and Herbert A. Einhorn, for plaintiff.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City (Russel H. Beatie, Jr., Weaver H. Gaines, Jr., David J. Goss and W. David Jamieson, New York City, of counsel), for defendants Tesoro, West and Phelps.

Skadden, Arps, Slate, Meagher & Flom, New York City (Michael W. Mitchell, Joan M. Secofsky and Douglas M. Kraus, New York City, of counsel), for defendants E. F. Hutton & Co. and Detwiler.

Bachner, Tally & Mantell, New York City (Seymour L. Mantell and Roy D. Toulan, New York City, of counsel), for defendants Wohlstetter and Nick & Co.

## OPINION

CANNELLA, District Judge:

This action arises out of a tender offer by Tesoro Petroleum Corporation ("Tesoro") for 5.5 million shares of the publicly-held common stock of Commonwealth Oil Refining Company, Inc. ("Commonwealth" or "Corco"). On Wednesday, April 23, 1975, Corco, the target company, commenced the instant action which alleges numerous violations of the provisions of the Federal Securities Laws and the margin requirements of the Federal Reserve Board. Concurrently, Corco sought the issuance of a temporary restraining order or a preliminary injunction pursuant to the provisions of Fed.R.Civ.P. 65, preventing Tesoro and the other named defendants from proceeding forward with, effecting or otherwise consummating the involved tender offer for Corco shares. In light of the fact that the offer was scheduled to terminate on Wednesday, April 30, 1975, this Court commenced its hearing of the matter on Thursday, April 24, 1975. Both sides were afforded a full opportunity to call any witnesses and produce any documentary evidence bearing upon the issues and allegations advanced by Corco. The hearing continued throughout the day on Friday, April 25th, and did not conclude until late in the afternoon of Saturday, April 26th. Upon its conclusion, and after the parties had been afforded an opportunity to agree upon the language to be contained in the appendix thereto, the Court issued the following order:

In view of the time factors involved in this case, the decretal paragraphs set out below precede our findings of fact and conclusions of law:

1) Plaintiff's application for a preliminary injunction is GRANTED to the extent indicated below and is otherwise denied.

2) The defendants are hereby enjoined from proceeding, effecting or consummating the involved tender offer unless and until the shareholders are provided with the material information recited in the appendix hereto [Appendix A to this Opinion], in the language there contained, by means of a supplemental offering statement issued in compliance with the provisions of the Williams Act.

3) That said tender offer shall not expire prior to 10:30 A.M. New York City Time on the 10th day after the date of public dissemination of the supplemental offer. All Shareholders of Commonwealth who have heretofore tendered or will hereafter tender their shares of Commonwealth pursuant to said Offer shall be allowed to withdraw such tendered shares until 10:30 A.M. New York City Time on the 7th day after public dissemination. Any shares tendered up to and including 10:30 A.M. New York City Time on the 10th day after public dissemination shall be accepted by the offeror on a pro rata basis as provided for in the Williams Act.

4) Security as provided for in Fed.R.Civ.P. 65(c) has been waived by defendants.

IT IS SO ORDERED.

In order to best satisfy the exigencies of the matter before us, the foregoing Order has been entered. What follows will amplify the conclusions contained therein and shall stand as the Court's findings and conclusions pursuant to Fed.R. Civ.P. 52(a).

### THE PARTIES AND ISSUES

Corco, the target company and the plaintiff herein, is a publicly-held corporation engaged in the business of refining petroleum products and the production of petrochemicals. It is incorporated under the Laws of Puerto Rico and maintains its principal place of business and production facility in that Commonwealth. The common stock of plaintiff is registered pursuant to § 12 of the Securities Exchange Act of 1934 and its shares are traded on both the New York and Pacific Stock Exchanges.

The offeror, Tesoro, a Delaware corporation with its principal place of business in Texas, is engaged in the exploration, development, and production of oil and gas reserves, as well as in the refining, transporting and marketing of crude oil and petroleum products. In addition, Tesoro is engaged in the manufacturing and leasing of oil field service equipment. As with Corco, its shares are registered pursuant to the terms of the 1934 Act and are traded on the New York and Pacific Stock Exchanges. Defendant West is the Chairman of the Board of Directors and Chief Executive Officer of Tesoro and defendant Phelps is its President.

Defendant E. F. Hutton & Co., Inc. ("Hutton") is a stock broker and investment banker which serves as the dealer-manager of the subject tender offer. Defendant Detwiler is Vice-Chairman of Hutton's Board and serves as the principal liaison between Hutton and the offeror. Detwiler is also a member of Tesoro's Board of Directors.

Defendant J. F. Nick & Co. ("Nick") is a limited partnership engaged in the business of trading securities and is the sole New York Stock Exchange specialist trading in Corco common stock. Defendant Wohlstetter is a general partner of Nick who served as a member of the Tesoro Board of Directors until April 17, 1975.

In compliance with the provisions of the Williams Act, the subject cash tender offer was filed with the Securities and Exchange Commission on Friday, April 18, 1975 at about 5:30 P.M. Thereafter, on Saturday, April 19, 1975, the terms of the offer appeared in The New York Times. The offer was scheduled to expire on April 30, 1975, at 10:30 A.M. New York City time (11 days after its announcement) and provided that Tesoro would purchase all shares of Corco tendered to it, up to 5.5 million, at a price of $11.50 per share. (Additional shares could be purchased at Tesoro's option and in conformity with the pro rata rule of the Act.) If the 5.5 million shares sought by Tesoro are tendered by Corco stockholders, Tesoro will own approximately 38% of the outstanding common shares of Corco and will thereby gain working control of the company. The offer further stated that all shareholders of Corco who had tendered their shares on or before April 28, 1975 at 10:30 A.M. New York City time would be afforded an opportunity to withdraw their tenders, but provided that all shares not so withdrawn or shares thereafter tendered would be irrevocably offered to Tesoro until June 15, 1975.

In attempting to secure the entry of preliminary injunctive relief preventing the consummation of the subject tender offer, Corco has raised and attempted to substantiate, by proof at the hearing, the following issues:

(1) That the pre-tender price of Corco stock was artificially depressed as the result of illegal manipulation on the part of defendant Wohlstetter, who contemporaneously served as a member of Tesoro's Board of Directors and as a general partner in Nick (or through the actions of a conspiracy which included Wohlstetter and the other defendants). In addi-

tion, it was alleged that defendant Hutton "procured a suspension of trading in the stock, thus creating an artificial ceiling on its price. . . ." (Affidavit of Norman C. Keith (as chief executive officer) in support of the Motion at ¶ 3(a)).

(2) That Tesoro's offer failed to disclose material information in the form of precise dollar figures regarding the possible loss of Commonwealth's tax exemption under Puerto Rican law because of a transfer of control resulting from the tender offer.

(3) That Tesoro's tender offer failed to disclose material information in the form of precise dollar figures regarding the possible impact of a successful tender offer upon Commonwealth's substantial benefits under the Federal Energy Administration's crude oil equalization program.

(4) That the secrecy which surrounded the offer, as well as the short time frame in which it was advanced, are illegal.

(5) That the offer was planned and prepared with the aid of illegal industrial espionage.

(6) That Tesoro violated the Williams Act by failing to reveal the names of the financial institutions advancing funds for the purchase of tendered stock and that any funds so advanced would be in violation of regulations promulgated by the Federal Reserve Board.

(7) That Tesoro had "cornered the market" in competent proxy solicitation firms, thereby depriving Commonwealth of an adequate opportunity to rebut Tesoro's "lightninglike" takeover attempt.

(8) That Tesoro violated § 13(d) of the Act in that either it or a group of which it was a part controlled more than 5% of Corco stock without making the requisite public disclosure of this fact.

For the reasons stated *infra*, we find that Corco has sustained its burden only with regard to the allegations recited in paragraphs 2 and 3 above and, accordingly, we have fashioned our relief in an endeavor to rectify those material omissions.

GENERAL PRINCIPLES OF LAW

It is well settled in this Circuit, that a preliminary injunction will issue "only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Sonesta Int'l Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2 Cir. 1973). *Accord,* Missouri Portland Cement Co. v. Cargill, Inc., 498 F.2d 851, 866 (2 Cir.), cert. denied, 419 U.S. 883, 95 S.Ct. 150, 42 L. Ed.2d 123 (1974); Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687, 692–93 (2 Cir. 1973); Broder v. Dane, 384 F.Supp. 1312, 1317 (S.D.N.Y.1974); General Host Corp. v. Triumph American, Inc., 359 F.Supp. 749, 753 (S.D.N.Y.1973).

In evaluating the propriety of preliminary injunctive relief in cases of the instant sort, the Court's attention must be directed toward the underlying purposes of the Williams Act. As we recently stated in Broder v. Dane, 384 F. Supp. at 1318:

In enacting this legislation, Congress was responding to the fact that the tender offer mechanism, the use of which had burgeoned in the 1960's, was substantially unregulated by the securities laws as they existed prior to 1968. As a result, shareholders to whom a tender offer was directed, often found themselves making a decision as to whether or not to tender without the benefit of an adequate factual foundation upon which to ground that decision.

In an effort to remedy this situation and to protect the shareholder to the fullest extent possible, the Act de-

mands "full and fair disclosure for the benefit of investors."[6] Concomitant-

6. S.Rep.No.550, 90th Cong., 1st Sess. 3 (1967).

ly, the often adverse interests represented by the offering company, and management of the target company, were duly considered.[7] Thus, as the

7. There was also recognition of the argument that from an economic point of view it would be unwise to unduly inhibit corporate takeovers in that they often "serve a useful purpose in providing a check on entrenched but inefficient management." *Id.*

Report of the Senate Committee on Banking and Currency stated,

> [t]he committee has taken extreme care to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. The bill is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.[8]

8. *Id.*

These views well comport with those expressed by Judge Friendly in Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 845 (2 Cir. 1970), as well as the later comments thereon by Judge Timbers in Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc. 476 F.2d 687, 698 (2 Cir. 1973):

> "While courts should vigorously enforce the policy of honesty and fair dealing prescribed by federal securities legislation, they must guard against the risk that, at the instance of incumbent management, they may be frustrating informed stockholders from doing what the latter want."

We have given careful attention to that consideration here. What we said in *Butler Aviation,* however, clearly presupposes that the shareholders are indeed informed—a premise which we have indicated above has been drawn into serious doubt in this case. *Id.* quoting from *Butler Aviation,* 425 F.2d at 845.

Thus, while it is undeniably true that Corco has standing to proceed in the manner it now does (*see, e. g., Gulf & Western, supra,* 476 F.2d at 695–96 n. 14), the Court must not allow itself to lose perspective of the underlying rationale of the Act. As one commentator has put it, "[m]anagement's action does not always reflect an attempt to protect the shareholder's freedom of decision but rather may reflect a desire to prevent the takeover and to preserve its control. Thus, the courts must carefully scrutinize management's claims of illegality and nondisclosure." Note, The Courts and The Williams Act: Try A Little Tenderness, 48 N.Y.U.L. Rev. 991, 1011 (1973). In addition, it must always be remembered that the protections of the Williams Act extend to all shareholders of the target company—both those who intend to divest themselves of ownership and those who do not. Both groups must be assured full, fair and adequate disclosure so that their decision to tender or retain their shares will be predicated upon a knowledgeable and informed evaluation of the alternatives. *Cf.,* Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 941 (2 Cir. 1969). *See also,* Note, Judicial Control of Cash Tender Offers—A Few Practical Recommendations, 50 Indiana L.J. 114, 115–16, 122–23 (1974). In the final analysis, when injunctive relief against an unfriendly tender offer is sought by entrenched management the Court does well to reflect upon the thoughts expressed by Judge Friendly in the *Electronic Specialty* case, "district judges must be vigilant against resort to the courts on trumped-up or trivial grounds as a means for delaying and thereby defeating legitimate tender offers" and must carefully scrutinize the claims raised in order to reach a resolution which best

advances the legitimate goals of the Williams Act. We must guard against the attainment of a result which violates the concept of neutrality embraced in the law by acceding to a position which benefits the dilatory or otherwise tactically calculated approach of either one or both of the competing corporate powers.

## THE CLAIMS

The principle statutory predicate for the injunctive relief sought by Corco is found in § 14(e) of the Act. This provision, which requires analysis in terms of the legal precepts adopted in connection with claims advanced under Rule 10b–5 (see, Broder v. Dane, 384 F.Supp. at 1319–20), makes it

> unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

(15 U.S.C. § 78n(e).) Hence, our analysis of the issues presented by the instant case can be categorized in terms of (1) misstatements, false statements and omissions; and (2) fraudulent, deceptive or manipulative practices. In addition, several of the matters which have been raised do not come within the scope of § 14(e); they will be discussed separately.

1. *Misstatements, false statements and omissions*

Falling within this category of potential § 14(e) violations are Corco's claims that Tesoro's offering statement failed to adequately disclose material facts regarding the potential impact of the success of the offer upon Corco's tax exemption under the Puerto Rican Industrial Incentive Act and upon the Company's receipt of benefits under the Federal Energy Administration's crude oil cost equalization program. In our view, Judge Mansfield's decision in Sonesta Int'l Hotels Corp. v. Wellington Associates, 483 F.2d 247, 251–53 (2 Cir. 1973), dispositively establishes the validity of these claims.

At the outset, we recognize that the omission of certain material from an offering statement is not alone sufficient to demonstrate that a probable violation of § 14(e) has occurred. The misstated or omitted matter must also be *material*. The concept of materiality is well stated in the following words of Judge Mansfield: "[t]he materiality of facts allegedly misstated or omitted depends, in turn, upon whether a reasonable investor *might* have considered them to be important in deciding whether to accept the tender offer." *Sonesta, supra,* 483 F.2d at 251 (emphasis added). While other courts have substituted "would" for "might" in the above formulation and thus have caused us to engage in extended discussion of which alternative formulation is properly invoked in a § 14(e) case, Broder v. Dane, 384 F.Supp. at 1320–21 (*and see* the recent Seventh Circuit decision in Northway, Inc. v. TSC Industries, Inc., 512 F.2d 324, 330–32 (7 Cir. 1975)), the distinction between these standards has no impact in the instant case. The precise dollar amounts involved with both the tax exemption and the FEA benefits are clearly material and important matters which, under any standard, should have been disclosed to the Corco stockholders.[1]

---

1. In seeking the entry of preliminary injunctive relief, Corco argues that the secrecy which surrounded the offer, as well as the short time frame in which it was advanced, renders the offer illegal. These contentions are without merit. Secrecy is a common condition surrounding tender offers and is a legitimate tactic which an offeror can invoke to dissipate the otherwise strong position enjoyed by entrenched management; it is as

That these omissions rise to the requisite level of materiality is amply evidenced by simply comparing the disclosure made by Tesoro in the original offering statement with that contained in the supplemental statement issued pursuant to this Court's Order of this past Saturday. In regard to the tax exemption and FEA benefits, the original offering statement made the following disclosure:

The Company and its subsidiaries and affiliates are the holders of various tax exemptions granted by the Commonwealth of Puerto Rico under the Puerto Rico Industrial Incentive Act. Under that Act, the tax exemption of a corporation is subject to forfeiture

appropriate, for example, as management's attempts at a delay in an effort to negotiate a defensive merger. *See generally*, Texasgulf, Inc. v. Canada Development Corp., 366 F. Supp. 374, 379–81 (S.D.Tex.1973); Note, 50 Indiana L.J. *supra* at 120–21; Note, 48 N.Y.U.L.Rev. *supra* at 994–95. Similarly, the short time frame of the offer, 11 days, though disadvantageous to Corco's management, is not a violation of the Williams Act. Speed is an asset of an offeror which the Act does not dislodge. As Messrs. Aranow and Einhorn (co-counsel for plaintiff herein) point out:

While the federal statutory provisions relating to tender offers do not expressly prescribe either the minimum or maximum length of the offering period, the combined effect of Sections 14(d)(5) and 14(d)(6) of the 1934 Act may create the same result.

Section 14(d)(5) provides, *inter alia*, that a depositor (tendering shareholder) may withdraw his shares " . . . at any time after sixty days from the date of the original tender offer . . . . " While the opportunity to withdraw does not preclude the offeror from continuing the bid for a longer period, it normally will be impractical to do so unless the offeror has received substantially fewer shares than it seeks to purchase as the risk of withdrawals must necessarily constitute a threat to the ultimate success of the offer.

Section 14(d)(5) also provides for withdrawal " . . . at any time until the expiration of seven days after the time definitive copies of the offer or request or invitation are first published . . . . " This clause, however, does not appear to require the offeror to purchase shares for at lease seven days if it does not choose to do so.

On the other hand, Section 14(d)(6), which provides that tendered shares must be purchased on a pro rata basis where the shares tendered exceed the number of shares to be purchased during the first 10 days of the offer, may require the offeror to continue to purchase shares for at least ten days.

However, where an offer is made for all outstanding shares, Section 14(d)(6) becomes inoperative and the offeror is not required to continue the bid for any minimum period of time.

E. Aranow and H. Einhorn, Tender Offers for Corporate Control 50–52 (1973). *See also*, Note, 50 Indiana L.J. *supra*; Note, 48 N.Y.U.L.Rev. *supra* at 993–995. Indeed, the timing of the subject offer is in complete compliance with guidelines stated in the New York Stock Exchange Company Manual A–180: "While it is desirable that a period of about 30 days be used, a tender offer should remain open for a minimum of 10 days, so that all stockholders, even though they may live at a distance, will have ample opportunity to learn of the tender offer and to tender their shares."

That the timing of the offer is not offensive to the statutory scheme does not render it irrelevant to the present dispute. Tesoro selected the time-frame of the offer and did so, admittedly, to handicap Corco's management as much as possible. Such determination was a conscious effort to limit the opportunity of management to reply to the offer. We believe that this timing decision should, therefore, properly be brought to bear upon the question of materiality. Judge Friendly suggested as much in the *Cargill* case: "Courts shoud [sic] tread lightly in imposing a duty of self-flagellation on offerors with respect to matters that are known as well, or almost as well, to the target company; some issues concerning a contested tender offer can safely be left for the latter's riposte." 498 F.2d at 873 (footnote omitted). *See also*, Electronic Speciality, *supra*, 409 F.2d at 948 (Friendly, J.). Where, as here, the offeror has consciously limited the target's ability to respond to the offer, it logically follows that the offeror be held to a higher standard of disclosure and that omissions which might have been overlooked in other contexts become material in these circumstances. *Cf.*, Broder v. Dane, 384 F.Supp. at 1318–19. *Compare*, Sonesta, 483 F.2d at 255 *with* Note, 50 Indiana L.J. *supra* at 128.

if shares of the corporation's stock are transferred without the prior written approval of the Governor of Puerto Rico, except in certain specified cases. That Act further provides that the Governor in his discretion may approve transfers retroactively in cases where a prior approval was required and not obtained and where retroactive approval would serve the best interest of Puerto Rico and the purposes of the industrial development program. Tesoro has been advised by Puerto Rico counsel that the purchase of less than a majority of the outstanding Shares will not require approval by the Governor. In the event that any such approval should prove to be necessary, Tesoro would promptly apply therefor. If any such required approval were not obtained, any resulting forfeiture of tax exemptions could have a material adverse effect on the Company.

As indicated in the Company's Annual Report on Form 10–K for 1974 and in its 1974 Annual Report to Stockholders, the Company receives substantial benefits under the crude oil cost equalization program adopted in November 1974 by the Federal Energy Administration. On the other hand, the program has increased the cost to Tesoro of the crude oil that Tesoro refines. As a result of this Offer, it is possible that the benefits received by the Company under the program may be reduced and that the cost to Tesoro of the program may be reduced. In that event, Tesoro may be required to compensate the Company for part or all of such benefits lost by the Company. Because of uncertainties involved in the application of the program and because of possible changes in the program, Tesoro is unable to predict the effect of this Offer on the Company's position under the program. It is possible, however, that the effect may be materially adverse.

In comparison, the supplemental offering statement discusses these matters in the following terms:

4. Additional Information Regarding Possible Loss of Tax Exemption. Commonwealth and its subsidiaries and affiliates are the holders of various tax exemptions granted by Puerto Rico under the Puerto Rico Industrial Incentive Act.

According to Commonwealth's Annual Report on Form 10–K for 1974, if the earnings of various subsidiaries and affiliates of Commonwealth had not been exempt from Puerto Rico income taxes an additional $29,220,501 in Puerto Rico income taxes would have been paid in 1974.

Under the Puerto Rico Industrial Incentive Act, the tax exemption of a corporation is subject to forfeiture if shares of the corporation's stock are transferred without the prior written approval of the Governor of Puerto Rico, except in certain specified cases. That Act further provides that the Governor in his discretion may approve transfers retroactively in cases where a prior approval was required and not obtained and where retroactive approval would serve the best interest of Puerto Rico and the purposes of the industrial development program. Tesoro has been advised by Puerto Rico counsel that the purchase of less than a majority of the outstanding Shares will not require approval by the Governor. Commonwealth has been advised by its counsel that the purchase of less than a majority of the outstanding shares, if such purchase directly, or indirectly results in a change in control, will require the approval of the Governor of Puerto Rico and that in such counsel's opinion such approval is a discretionary matter and there can be no assurance that such approval will actually be forthcoming. If any such approval by the Governor should be required, then Tesoro intends to apply promptly therefor. If any such required ap-

proval is not obtained, the forfeiture of tax exemption would have a material adverse effect on Commonwealth.

Commonwealth's counsel has advised that, in addition to the loss of tax benefits at the corporate level, if Commonwealth's tax exemptions are forfeited, shareholders who are residents of Puerto Rico and would enjoy income tax exemptions on portions of dividends received from Commonwealth and gains derived from a sale of their shares of stock in Commonwealth will lose such exemptions.

5. Additional Information Regarding Possible Loss of FEA Entitlements. As indicated in Commonwealth's Annual Report on Form 10–K for 1974 and in its 1974 Annual Report to Stockholders, Commonwealth receives substantial benefits under the crude oil cost equalization program adopted in November 1974 by the Federal Energy Administration. On the other hand, the program has increased the cost to Tesoro of the crude oil that Tesoro refines. As a result of the Offer, it is possible that the benefits received by Commonwealth under the program may be reduced and that the cost to Tesoro of the program may be reduced. In that event, Tesoro may be required to compensate Commonwealth for part or all of such benefits lost by Commonwealth. Because of uncertainties involved in the application of the program and because of possible changes in the program, Tesoro is unable to predict the effect of the Offer on Commonwealth's position under the program. It is possible, however, that the effect may be materially adverse.

In this connection, it should be noted that, Commonwealth has informed Tesoro that for the months of November and December, 1974, and January and February, 1975, this program re-

sulted in benefits to Commonwealth from the sale of entitlements of $1,613,580, $4,859,825, $2,094,102 and $6,165,187, respectively. If Tesoro were deemed by the FEA as controlling Commonwealth, and as a single refiner with Commonwealth, Commonwealth believes that it could lose benefits at least equivalent to the costs Tesoro incurs under the program. For the same four months, Tesoro's costs for the purchase of entitlements were $755,515, $523,310, $1,620,336 and $2,355,298, respectively. If Tesoro acquires working control of Commonwealth as a result of the Offer, any compensation which Tesoro agrees to pay to Commonwealth for benefits lost by Commonwealth under this program may result from negotiations other than at arm's length.

Plainly, the additional matter contained in the supplemental statement is such that "a reasonable stockholder might . . . [attach] importance" to it and such shareholder could well consider "the information to be of considerable importance in making his decision." *Sonesta, supra,* 483 F.2d at 252. When told that the success of Tesoro's efforts might have a "materially adverse" effect on Corco, a reasonable shareholder may well ask, "How material is material?" When told that in 1974 the Puerto Rico tax exemption resulted in a saving to Corco of $29,220,501, the shareholder is far better able to understand the consequences of his decision to tender or not and can intelligently choose between the two alternatives. Similar results are obtained when hard dollar figures are provided in connection with the FEA program. As the Court of Appeals well put it in the *Sonesta* case, 483 F.2d at 252:[2]

Here a simple reference in relevant Arabic numerals to the [value of the tax exemption and FEA benefits]

---

2. As one court has stated:
   Clearances from administrative agencies need not be secured prior to a final tender offer *provided disclosure is made of the potential loss and its value* in an amended

tender offer. Ronson Corporation v. Liquifin Aktiengesellschaft, 483 F.2d 846 (3d Cir. 1973).

Texasgulf, Inc. v. Canada Development Corp., 366 F.Supp. at 429 (emphasis added). This

. . . would have alerted [the] stockholders to the potential significance of the possible ["materially adverse" impact a successful Tesoro bid might have on Corco]. The standard of materiality was not whether the non-disclosure was "major," . . . but whether a reasonable stockholder might have attached importance to the omitted facts. If these simple facts had been disclosed in the present case, we have no hesitancy in concluding, that a reasonable shareholder, contemplating a sale of all or part of his shares, might well have considered the information to be of considerable importance in making his decision.

■ The only defense which Tesoro apparently interposes as to this claim is that no reasonable likelihood that "materially adverse" consequences with regard to the taxes and FEA benefits would, in fact, occur as the result of a successful offer. In this regard it is recognized that

To be material a statement [or omission] in a tender offer need not necessarily relate to a past or existing condition or event. It may refer to a prospective event, even though the event may not occur, provided there appears to be a reasonable likelihood of its future occurrence. Gulf & Western Industries, Inc. v. Great Atlantic and Pacific Tea Co., supra, Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247 (2d Cir. 1973).

In addition, "Whether facts are material . . . when the facts relate to a particular event . . . will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) cert. denied, 394 U.S. 976, 89 S.Ct.

1454, 22 L.Ed.2d 756 (1969), as cited in Sonesta v. Wellington Associates, supra.

Texasgulf, Inc. v. Canada Development Corp., 366 F.Supp. 374, 421 (S.D.Tex. 1973). Having chosen to make the Commonwealth shareholders aware of the possible adverse consequences of a successful Tesoro bid, the offeror could not stop there. Rather, it was obligated to make full and complete disclosure of all relevant and material facts bound up with the tax exemption and FEA benefits so as to afford the stockholders sufficient predicate for a knowledgeable and enlightened decision. In short, the initial disclosure necessitates the further disclosure and the contents of the original offering statement renders any contrary contention without merit. (We are not called upon to decide the question of whether or not the omission of all references to the tax question and FEA benefits would have constituted a material omission. However, given the conflicting legal opinions presented on this undeniably material issue, we do not doubt that such an omission would have presented serious and substantial questions). As Judge Mansfield put in Sonesta, the "obligation is placed squarely on those making the offer in the first instance to disclose all material factors necessary to make their offer not misleading. That duty cannot be shifted to the shoulders of others." 483 F.2d at 255.

2. *Fraudulent, deceptive or manipulative practices*

Four of the issues advanced by Corco come within the scope of this category: (1) the alleged manipulative practices of defendant Wohlstetter; (2) the actions of Hutton in securing the stop-trading order of April 17th; (3) the allegations of industrial espionage; and (4) the "cornering" of the proxy solicitors market. We find each of these claims to be insufficient predicate for preliminary

proposition is equally applicable to both the need for the Governor's approval in the tax exemption instance and the FEA ruling in that of the crude oil benefits program.

injunctive relief; plaintiff has failed to sustain its burden of clearly showing entitlement thereto. In light of this failure of proof (or adequate legal basis), we deal with each such allegation in summary fashion.

In order for Corco to have prevailed on any of these claims it was required to satisfy the applicable standard for injunctive relief by producing competent evidence of "fraudulent, deceptive, or manipulative acts or practices . . ." in violation of § 14(e). As we have noted *supra*, such analysis is akin to that utilized in a case arising under Rule 10b-5. *See generally*, Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 362–64 (2 Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed. 2d 148 (1973). However, in the instant case, the proof adduced at the hearing is of a nature which obviates the need for an extended discussion of legal principles.

■ As regards Corco's claim concerning defendant Wohlstetter's alleged manipulations of the price of Corco stock, the proof clearly does not rise to a level sufficient for the entry of injunctive relief. No one disputes the potential for "speculative abuse" or conflict of interest of which Wohlstetter was possessed because of his service as both a partner in Nick and a member of Tesoro's Board. However, this relationship was, to use a phrase, "open and notorious." Corco should have known that a partner in the sole specialist in its common stock was on Tesoro's Board and it did nothing about it, even after Tesoro had made its initial, albeit friendly, overtures towards plaintiff. At the hearing, Wohlstetter denied having any knowledge of the impending tender offer and Corco has not proved oth-

erwise. In fact, Wohlstetter was not even questioned concerning his role in Nick or whether or not he had any dealings whatever in Corco stock; much less whether he had manipualted the price. Plaintiff would have us speculate that he did, but no competent proof was adduced. Wohlstetter testified that he resigned from the Tesoro Board on April 17th, after trading in Corco stock had been halted by the exchange and after being advised for the first time of the involved offer. (Tr. at 223–24.) In addition, Corco had available to it the trade sheets of its own stock which it could have used to substantiate the allegation of manipulation by Nick. Such evidence could possibly have led to an inference in plaintiff's favor, but it was not produced. In short, the allegations concerning Wohlstetter can not stand as basis for injunctive relief on the evidence advanced.[3] *Compare*, this Court's opinion in Butler Aviation Int'l, Inc. v. Comprehensive Designers, Inc., 307 F. Supp. 910 (S.D.N.Y.1969), aff'd, 425 F. 2d 842 (2 Cir. 1970).

■ Corco attempts to remedy this failure of proof by urging that the Court adopt a *per se* rule. They ask that we find the existence of Wohlstetter's dual role to be sufficient ground for an injunction. While plaintiff makes reference to numerous statutes and rules to support its position, we find that such provisions are inapposite, and although the crux of their position— "[a] specialist . . . must, like Caesar's wife, be above suspicion" (Brief at 30)—is worthy of cognizance, it is not alone enough to secure the relief sought. It may well be true that the precise circumstances in which Wohlstetter is now found are indeed unique, however, the Court does not doubt that specialists of-

3. We are cognizant that Exhibit 6 indicates that Wohlstetter was present at and participated in a meeting between West and Edward Carey (President and sole stockholder of New England Petroleum Co. and one of the two largest shareholders of Corco) on February 20, 1974. We express no opinion concerning the propriety of Wohlstetter's involvement in the meeting in view of his position in Nick. It is clear, however, that the meeting bears no relationship to the instant controversy.

ten sit on the board of one or more corporations. Indeed, the relevant stock exchange rule provides only that one may not serve on the board of a corporation in whose stock he is a specialist. NYSE Rule 460(b). If the industry viewed the other side of the coin as equally tarnished, a *per se* rule could easily be adopted. In sum, and without belaboring the point, we decline to adopt the *per se* rule urged by Corco. If such a rule is to be found necessary to insure the proper and honest functioning of the stock markets, we do not doubt that an appropriate provision will be enacted either by the Congress, the SEC or the Exchanges themselves.

Corco also alleges that defendant Hutton engaged in a manipulative practice when it notified the NYSE that a meeting of Tesoro's Board of Directors for the purposes of voting on the authorization of the instant tender offer was imminent. That such a phone call was made is readily admitted by the defendants; that the call violated § 14(e) or any other provision of the Act is, however, a legal proposition which Corco cannot support and which this Court will not adopt. Whatever Hutton's "intent" was in making the phone call, it is undisputed that the facts related to the Exchange were entirely accurate. That soon thereafter, the Exchange, in its sole discretion, chose to halt trading in Corco, and that this halt inured to the benefit of Tesoro because it forestalled the then ongoing rise in the price of Corco's stock are surely not occurrences which subject Hutton to liability under the Act. Plaintiff's claim that it was a material omission for Tesoro to fail to state that trading in Corco stock had been halted soon after a call to the Exchange by Hutton, but the Court is unable to perceive how such disclosure might in any way have affected a shareholder's decision to tender or retain his

shares; it can not be considered "material." *See* the discussion supra pp. 274–276, 277–278.

Perhaps the most "novel" claim of manipulation advanced by Corco is its argument that Tesoro's retention of the three leading proxy solicitation firms violates the Act because it prevents Corco from obtaining competent assistance in the now raging battle. To state the proposition is to refute it, especially once one remembers that the free enterprise system is not entirely dead in the United States. Similarly, Corco's allegations concerning industrial espionage are not persuasive. While some forms of "spying" [4] might have been engaged in, there is no substantial showing which connects these endeavors to any material part of the offer, nor would disclosure of how Tesoro obtained some information serve any useful shareholder purpose. There is no proof that such conduct is a fraudulent, deceptive or manipulative act or practice.

### 3. *Other Items*

[17, 18] Several other claims have been advanced by Corco. These include: (1) the allegations that Tesoro failed to identify the sources of the financing for the tender offer and that by virtue of its being a holder of 5% of Corco stock without making a public disclosure of that fact it violated §§ 13(d) and 14(d); and (2) the allegation that its financial arrangements violated the Federal Reserve Board's margin requirements. No lengthy discourse addressed to these points is warranted as we find that Corco has failed to clearly demonstrate that these allegations are of substance, much less of a nature which commands the entry of extraordinary injunctive relief. As to (1), Corco failed to introduce any evidence supporting the proposition that Tesoro or any "group" with which it was allied owned 5% or more of Corco's

---

4. By the term "spying" we mean the clandestine gathering of information about Corco and we do not find any evidence which shows such conduct to be other than legal.

stock.[5]  As to (2), although Corco intermittently made reference to Regulations G, U and T, it has never explained to the Court what actions by Tesoro were in violation of these regulations.

## RELIEF

### 1. *Nature of the Relief*

■ In view of our conclusion that the only basis for preliminary injunctive relief lies in the incomplete disclosure of material items concerning the Puerto Rico tax exemption and the FEA benefits, we find that the sort of relief entered by this Court in Broder v. Dane, 384 F.Supp. at 1323–24, is wholly appropriate.[6]  Such relief as was directed in our Order of last Saturday well recognizes the balance of hardships which here tips in favor of plaintiff, or perhaps more properly, the shareholders of Corco, in whose interest further disclosure will be made.  Thus, the salutary purposes of the Williams Act, to insure a knowledgeable shareholder decision predicated upon full, fair and adequate disclosure of all material matter, are best effectuated by compelling further disclosure and delaying the offer in order to insure that the new matter might be carefully considered.  To quote from *Broder*:

> In evaluating the balance of the hardships, the Court takes cognizance of the repeated declarations by our court of appeals that in tender offer cases the flexible application of a preliminary injunction is often the best manner in which to effectuate the goals of the Williams Act.  This is not to say that injunctive relief should be granted lightly, but when a plaintiff raises serious questions going to the merits, and relief can be fashioned which protects the public investor

without significantly damaging the offering party, such relief is fully warranted.  *See* M.G.M. v. Transamerica Corp., 303 F.Supp. 1344, 1348 (S.D.N.Y.1969) (Mansfield, J.).

In this matter, an injunction permitting the Exchange Offer to proceed on the condition that the omitted material information be disseminated to all shareholders and permitting previously tendering shareholders to withdraw their shares, will serve the purposes of the Williams Act by providing [the] shareholders with full and fair disclosure of all material facts *prior* to the tender of their shares, and by assuring that the tender offer not be permitted to proceed to fruition until the shareholders are adequately apprised of all material facts necessary to permit them to make an informed judgment as to the advisability of tendering their shares. As Judge Mansfield put it in *Sonesta*, 483 F.2d at 250–51,

> preliminary injunctive relief is a particularly useful remedy for prevention of probable violations of the disclosure requirements of the Act, for the reason that prior to consummation of the offer the court still has a variety of methods available to it for correction of the misstatements or omissions.  *See, e. g.*, Butler Aviation Int'l Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 845 (2d Cir. 1970).  But once the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to "unscramble the eggs."  Electronic Speciality Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969); Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Company, Inc., *supra,*

---

5.  Corco's introduction of Exhibits 4 and 5 do not suggest a contrary conclusion.  They do not demonstrate that Tesoro ever acquired Corco shares in violation of the Williams Act, a fact which, if true, could be easily proved.

6.  While we recognize that the facts of *Broder*, an attempt by a publicly-held corporation to

"go private," make that decision readily distinguishable from this hotly contested tender offer, we nonetheless find that the type of relief formulated in that case is wholly appropriate in the present circumstances.

476 F.2d 687, 698. On the other hand, preliminary relief does not, in assuring that the offer will be lawfully made, sacrifice the legitimate desires of shareholders to accept the offer. If the offeror is subsequently vindicated after a trial on the merits, the offer may be renewed. *Thus, in the normal situation, when it appears likely that the offer may contain materially misleading statements or omissions as made, the interest of the shareholders and of the public in full disclosure of relevant circumstances renders preliminary injunctive relief an appropriate method of remedying the deficiencies in disclosure before the offer is consummated.* [Emphasis Added]

*Accord* Gulf & Western Ind., *supra*, 476 F.2d at 698–99; Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 844–845 (2d Cir. 1970); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969); General Host Corp. v. Triumph American, Inc., 359 F.Supp. 749, 758–59 (S.D.N.Y.1973); Ronson Corp. v. Liquifin, Civ. 785–73 (D.N.J., July 3), aff'd, 483 F.2d 846, 851 (3d Cir. 1973).

The injunction required by this decision is not one which will result in the demise of [the] . . . Offer (*compare Missouri Portland,* 498 F.2d at 870). . . . [I]t will merely cause a delay for the time needed to prepare a supplementary statement in keeping with this opinion. There has been no suggestion by [the offeror] that there are any reasons which would cause [it] not to renew its Offer. . . . While it is of course true that compliance with this Court's mandate will result in again extending the expiration date of the Offer . . . the Court does not believe this to be a factor which in any way tips the balance of hardships.

*Id.* (footnote omitted). *Accord* Corenco Corp. v. Schiavone & Sons, Inc., 488 F. 2d 207, 215 (2 Cir. 1973); Aranow & Einhorn, *supra* at 294; Note, 48 N.Y.U. L.Rev. *supra* at 1016–17.

2. *Timing*

In our Order of last Saturday, we directed that Tesoro's offer be extended for ten days "after the date of public dissemination of the supplemental offer" transmitting to the shareholders the material information relating to taxes and FEA benefits which had been omitted from the original statement. In addition, we granted the shareholders the right to withdraw their tenders until the seventh day after the required public disclosure and based any pro rata rights upon the entire number of shares tendered at the close of the amended offering period. We then felt (*compare* our discussion *infra*) that the substantial nature of the disclosures directed (or contrariwise, the matters earlier omitted) warranted the extension of the offer for the ten days specified in our Order, so as to allow the Corco shareholders a full and adequate opportunity to receive, evaluate and consider the new information prior to being called upon to make their decision. The state of the record then before us made such disclosures of primary significance to an informed shareholder—the kind of shareholder envisioned by the Williams Act. We therefore concluded that, in light of all the relevant criteria, the offer should be extended in a fashion which complied with the minimum legal time-frame for a new offer. *See,* the discussion in n. 1, *supra.* Such timing, we believed, would have best effectuated the purposes of the Act, in light of the then pertaining circumstances, and, at the same time, would not have upset the principles of neutrality envisioned by the Act as between the two competing corporations (namely, the offeror's interest in the speedy completion of the offer and the target's desire to engender as much delay as possible).

*Post-Hearing Developments*

At the close of the proceedings before the Court on Saturday, the parties took the steps necessary for compliance with the Court's Order. A supplemental offering statement in conformity with our ruling (Appendix A hereto) was prepared, filed with the SEC and placed with the New York Times and Wall Street Journal for publication on Tuesday, April 29th. However, prior to the time that public dissemination of this data could be achieved, new developments caused defendants Tesoro and Hutton to call a halt to the distribution process.

On the evening of April 28th, the Puerto Rico Economic Development Administration issued the following press release concerning the impact of a successful Tesoro offer upon Corco's tax exempt status:

—TESORO PETROLEUM ASSURED COMMONWEALTH OIL WON'T LOSE PUERTO RICO TAX EXEMPTION

SAN JUAN –DJ– OFFICIALS OF PUERTO RICO'S ECONOMIC DEVELOPMENT ADMINISTRATION SAID THEY HAVE ASSURED ROBERT V WEST JR TESORO PETROLEUM CORP'S CHAIRMAN AND CHIEF EXECUTIVE THAT TESORO'S TENDER OFFER FOR COMMONWEALTH OIL REFINING CO. STOCK DOESN'T POSE A THREAT TO COMMONWEALTH OIL'S TAX–EXEMPT STATUS IN PUERTO RICO.

TESORO IS SEEKING TO ACQUIRE 5.5 MILLION OR ABOUT 38 PC OF PUERTO RICO–BASED COMMONWEALTH OIL'S 14.5 MILLION OUTSTANDING SHARES. AN EDA OFFICIAL SAID TESORO WOULD BE GIVEN A WRITTEN LEGAL OPINION FROM EDA THAT COMPLETION OF THE TENDER WOULDN'T AFFECT COMMONWEALTH'S TAX STATUS. THE OPINION WAS BEING DRAFTED THIS AFTERNOON BY EDA'S CHIEF LEGAL ADVISOR A SPOKESMAN SAID.

AN EDA OFFICIAL SAID THAT AT LEAST 80 PC OF COMMONWEALTH'S STOCK WOULD HAVE TO BE ACQUIRED BY AN OUTSIDE CONCERN FOR COMMONWEALTH TO LOSE ITS TAX EXEMPT STATUS.

–0–6 01 PM EDT APR 28–75

APR 28–75

Thereafter, at a hearing held before the Court on April 29th, the following letter from Mariano H. Ramirez-Bages, Special Counsel to the Economic Development Administrator to Dr. West of Tesoro dated April 28, 1975, was presented to us:

In answer to your inquiry of today, my opinion is that the acquiring by your company of 38% of the stock of Commonwealth Oil Refining Company under your tender obligation, and in no event more than 55% of such stock requires no prior approval of such acquisition by the Governor of Puerto Rico (Industrial Incentive Act of 1963, Section 6(b)(3)). The tax exemption decrees granted to Commonwealth Oil Refining Company by the Government of the Commonwealth of Puerto Rico are in no way affected by any such transfer of stock and continue in full force and effect during the term of each one so long as the grantee continues to comply fully with the terms and conditions of each such decree.

On the basis of these documents, Tesoro and Hutton urge that the disclosure regarding the tax exemption, required by the Court's earlier Order, be modified on the ground that there now appears to be no reasonable likelihood that the exemption would be lost if Tesoro's bid succeeds. *See, Sonesta, supra,* 483 F.2d at 251 and our discussion *supra* p. 278.

In light of these developments, Corco continues to maintain that the Governor of Puerto Rico has sole discretion with regard to continuing the exemptions

and, therefore, that the opinion of the Economic Development Administration is valueless. It urges that the disclosure directed by the earlier Order now be made.

■ The Court does not adopt either of the views advanced. While defendants appear to be on firm ground in urging that no reasonable likelihood exists of the loss of the exemption, we find that this argument should not preclude further disclosure. Having discussed the exemption in the original offer, a portion of the supplemental statement should be devoted to the tax matter and should reflect its present status. Even if the Court had not ordered further disclosure in the earlier Order, Tesoro would be obliged to disclose the recent developments under the continuing disclosure requirements of the Act. *See,* § 13(d)(2) of the Act and Rule 13d–2 promulgated thereunder; § 14(d)(1) of the Act and rule 14d–1(b) promulgated thereunder; GAF Corp. v. Milstein, 453 F.2d 709, 720–21 (2 Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L. Ed.2d 821 (1972); Ronson Corp. v. Liquifin Aktiengesellschaft, 370 F.Supp. 597, 602 and 602 n. 11 (D.N.J.), aff'd, 497 F.2d 394 (3 Cir.) (*per curiam*), cert. denied, 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974).

On the other hand, the Court can not now direct that the disclosure previously ordered (Appendix A) be made. We so hold simply because the matter contained in the earlier document would clearly be misleading at the present time. Therefore, the Court concludes that the statement concerning the status of the tax exemption which is now contained in the revised supplemental offering statement (annexed hereto as Appendix B) makes adequate disclosure of the material aspects of the tax problem and is sufficient to convey the relevant data to the stockholders of Corco.

In like fashion, Tesoro now contends that the recent FEA ruling in Getty Oil Co. (Eastern Operations), Inc., Skelly Oil Co., 2 FEA ¶ 83,041 (February 11,

1975), renders it beyond the realm of reasonable likelihood that a successful tender by Tesoro will have a materially adverse impact on Corco's benefits under the cost equalization program. However, counsel for Tesoro has agreed to include the matter previously included in Appendix A in the revised supplemental statement and the Court finds such disclosure to be appropriate when it is coupled with the additional language which has been inserted in Appendix B pursuant to our direction. This additional matter states:

Attention is invited to the decision and order of the Federal Energy Administration in *Getty Oil Company (Eastern Operations), Inc., Skelly Oil Company, New York, New York* (2 FEA ¶ 83,041; decided February 12, 1975) which held that those two refiners, under common control, should be treated as separate firms for purposes of the crude oil cost equalization program. Counsel for Tesoro believes that, under this decision, Tesoro and Commonwealth would also be treated as separate firms for purposes of the crude oil cost equalization program and that, therefore, with respect to such program, the consummation of the Offer will not have a material adverse effect on Commonwealth.

■ In addition to directing that the supplemental disclosures be revised in light of the post-hearing developments, after hearing the parties on April 29th, the Court took one further step: we modified the timing of the offer. As the situation existed after the entry of the Order of April 26th, the offer was scheduled to close ten days after public dissemination of the supplemental data, with withdrawal rights running until the seventh day. As now modified, the offer will be open until May 6 at 5:00 P.M., New York City time, or seven days from publication on April 30th. The same seven day withdrawal period pertains under the amended schedule. While Corco doth greatly protest against

these changes, we find that the policies of the Act are advanced by their adoption.

It must be remembered, as noted earlier (*supra* p. 278), that:

> [W]hether facts are material . . . when the facts relate to a particular event . . . will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.

SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833, 849 (2 Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). This principle finds appropriate application in the changing circumstances of this case. At the close of the hearing on Saturday, the Court was of the opinion that there existed a reasonable probability—more than a mere possibility—that a successful Tesoro bid might have an adverse impact upon Corco's tax exemption and FEA benefits. As matters now stand, in light of the documents presented since Saturday, we find that the indicated probability of the occurrence of either of such adverse events has been significantly minimized. Thus, while "the anticipated magnitude of" either one or both adverse events "in light of the totality of the company activity," *i. e.*, the amount of the potential loss, has remained constant throughout our considerations, "the indicated probability that the event will occur" has been dramatically diminished by virtue of the more recent data.

The impact which the tax and FEA benefits materials contained in the supplemental statement will have upon the reasonable shareholder's decision to tender or not to tender has thus been greatly reduced. The nonoccurrence of either event is not relevant to the shareholders' decision, rather, it is the likelihood of one or both of these adverse consequences occurring which might cause an otherwise loyal Corco shareholder to divest himself of the stock. A shareholder might find it ill-advised to retain his interest in Corco if the company were to be placed in these financial straits as a consequence of Tesoro's acquisition of the 38% control interest presently sought. Thus, a shareholder who did not intend to tender his shares under the original offering statement will find no information in the supplemental statement to cause him to change his mind. On the other hand, those stockholders who have already tendered or who intend to do so, may find that the new disclosures dissuade them from their intended course or cause them to withdraw previously tendered shares and retain their interest in Corco.

It is with these considerations in mind that the Court ordered that the revised offer be kept open for seven days, rather than the ten requested by Corco or the six sought by Tesoro. By requiring that the offer remain open for seven additional days (beyond April 30) and that all shareholders be allowed to withdraw tendered shares until that point in time, those shareholders who might find the new information material are assured of an ample opportunity to consider the data and reach the reasoned decision contemplated by the Williams Act. At the same time, by refusing to accede to the time-frames proposed by either corporate party, we have preserved (and advanced) the principle of neutrality embraced in the Act.

## CONCLUSION

The parties are hereby directed to proceed in conformity with the Order of the Court dated April 26, 1975 as modified by the Order of April 29, 1975, and as directed in this Opinion. A stay of our Orders pending appeal pursuant to Fed.R.Civ.P. 62(c) and Fed.R.App.P. 8 is hereby denied.

The foregoing constitute the Court's findings of fact and conclusions of law upon plaintiff's application for a preliminary injunction.

It is so ordered.

SUPPLEMENT AND EXTENSION

TO

OFFER TO PURCHASE SHARES OF COMMON STOCK

OF

COMMONWEALTH OIL REFINING COMPANY, INC.

For Cash at

$11.50 Net Per Share

---

THE OFFER EXPIRES ON MAY 9, 1975 AT 10:30 A.M.,
NEW YORK CITY TIME, UNLESS
FURTHER EXTENDED

---

To the Holders of Common Stock
of Commonwealth Oil Refining Company, Inc.:

1. *Litigation.* On April 23, 1975, Commonwealth Oil Refining Company, Inc., a Puerto Rico corporation (the "Company" or "Commonwealth") instituted an action in the United States District Court for the Southern District of New York alleging violations by Tesoro Petroleum Corporation, a Delaware corporation ("Tesoro"), E. F. Hutton & Company Inc. and others of Sections 7, 9, 11, 13, 14 and 20 of the Securities Exchange Act of 1934 in connection with the Offer, and sought an injunction, damages and other appropriate relief. District Judge Cannella, after hearings held on April 24–26, 1975, ordered Tesoro to extend, until the dates and times set forth in Sections 2 and 3 hereof, the expiration of the Offer and the right of the Company's stockholders to withdraw their Shares. In addition, Judge Cannella ordered that the information contained in paragraphs 4 and 5 hereof be included in a supplement to the Offer.

2. *Extension of Offer.* Tesoro has extended to 10:30 A.M., New York City time, on May 9, 1975, its offer to purchase, upon the terms and conditions set forth in the Offer to Purchase dated April 18, 1975, as supplemented through this Supplement and Extension dated April 28, 1975, and in the related Letter of Transmittal ("Offer"), up to 5,500,000 shares of Common Stock, par value $5.00 per share (the "Shares"), of the Company, at $11.50 per Share net to the seller in cash. *The Offer is not conditioned upon any minimum number of Shares being tendered.*

Tesoro will purchase any and all Shares which are duly tendered by 10:30 A.M., New York City time, on May 9, 1975, up to 5,500,000 Shares.

If more than 5,500,000 Shares are duly tendered by 10:30 A.M., New York City time, on May 9, 1975, Tesoro will purchase at least

5,500,000 Shares and Tesoro may elect to purchase all or any part of the Shares tendered in excess of 5,500,000 Shares. If more than 5,500,000 Shares are duly tendered by such time and if Tesoro elects to purchase less than all the Shares so tendered, all Shares purchased will be purchased on a pro rata basis, with appropriate adjustments to avoid the purchase of fractional Shares. If less than 5,500,000 Shares are duly tendered by 10:30 A.M., New York City time, on May 9, 1975, Tesoro will purchase all such Shares.

If Tesoro further extends the Offer, all Shares tendered during any extension which are purchased by Tesoro will be purchased on a first-come, first-served basis unless otherwise announced at the time of such extension.

Payment for all Shares duly tendered and purchased pursuant to the Offer will be made as soon as practicable after May 9, 1975. Certificates for any unpurchased Shares will be returned without expense to the tendering stockholders as soon as practicable after the expiration of the Offer. Tesoro will pay all stock transfer taxes, if any, on the purchase of Shares by it (see Instruction 5 to the Letter of Transmittal), as well as all charges and expenses of the Depositary and the Forwarding Agent.

3. *Withdrawal of Tender.* Stockholders who have previously tendered their Shares or who hereafter tender their Shares pursuant to the Offer may withdraw any or all Shares so tendered at any time prior to 10:30 A.M., New York City time, on May 6, 1975 or, if such Shares have not previously been purchased by Tesoro, at any time after June 15, 1975. To be effective, written or telegraphic notice of withdrawal must be timely received by the Depositary at its address set forth below. Such notice must specify the name of the tendering stockholder, the number of Shares to be withdrawn, the serial number of each deposited certificate evidencing the Shares to be withdrawn and the name in which each such certificate is registered if different from that of the tendering stockholder. All questions as to the validity (including time and receipt) of such notices will be determined by Tesoro, whose determination shall be final and binding. Any Shares withdrawn will be deemed not duly tendered for purposes of the Offer. Approximately 35,000 Shares have been deposited or guaranteed to be deposited at the date of this Supplement and Extension.

Except as otherwise stated in this Section, all tenders are irrevocable.

4. *Additional Information Regarding Possible Loss of Tax Exemption.* Commonwealth and its subsidiaries and affiliates are the holders of various tax exemptions granted by Puerto Rico under the Puerto Rico Industrial Incentive Act.

According to Commonwealth's Annual Report on Form 10–K for 1974, if the earnings of various subsidiaries and affiliates of Com-

monwealth had not been exempt from Puerto Rico income taxes an additional $29,220,501 in Puerto Rico incomes taxes would have been paid in 1974.

Under the Puerto Rico Industrial Incentive Act, the tax exemption of a corporation is subject to forfeiture if shares of the corporation's stock are transferred without the prior written approval of the Governor of Puerto Rico, except in certain specified cases. That Act further provides that the Governor in his discretion may approve transfers retroactively in cases where a prior approval was required and not obtained and where retroactive approval would serve the best interest of Puerto Rico and the purposes of the industrial development program. Tesoro has been advised by Puerto Rico counsel that the purchase of less than a majority of the outstanding Shares will not require approval by the Governor. Commonwealth has been advised by its counsel that the purchase of less than a majority of the outstanding shares, if such purchase directly or indirectly results in a change in control, will require the approval of the Governor of Puerto Rico and that in such counsel's opinion such approval is a discretionary matter and there can be no assurance that such approval will actually be forthcoming. If any such approval by the Governor should be required, then Tesoro intends to apply promptly therefor. If any such required approval is not obtained, the forfeiture of tax exemption would have a material adverse effect on Commonwealth.

Commonwealth's counsel has advised that, in addition to the loss of tax benefits at the corporate level, if Commonwealth's tax exemptions are forfeited, shareholders who are residents of Puerto Rico and would enjoy income tax exemptions on portions of dividends received from Commonwealth and gains derived from a sale of their shares of stock in Commonwealth will lose such exemptions.

5. *Additional Information Regarding Possible Loss of FEA Entitlements.* As indicated in Commonwealth's Annual Report on Form 10–K for 1974 and in its 1974 Annual Report to Stockholders, Commonwealth receives substantial benefits under the crude oil cost equalization program adopted in November 1974 by the Federal Energy Administration. On the other hand, the program has increased the cost to Tesoro of the crude oil that Tesoro refines. As a result of the Offer, it is possible that the benefits received by Commonwealth under the program may be reduced and that the cost to Tesoro of the program may be reduced. In that event, Tesoro may be required to compensate Commonwealth for part or all of such benefits lost by Commonwealth. Because of uncertainties involved in the application of the program and because of possible changes in the program, Tesoro is unable to predict the effect of the Offer on Commonwealth's position under the program. It is possible, however, that the effect may be materially adverse.

In this connection, it should be noted that, Commonwealth has informed Tesoro that for the months of November and December, 1974, and January and February, 1975, this program resulted in benefits to Commonwealth from the sale of entitlements of $1,613,580, $4,-859,825, $2,094,102 and $6,165,187, respectively. If Tesoro were deemed by the FEA as controlling Commonwealth, and as a single refiner with Commonwealth, Commonwealth believes that it could lose benefits at least equivalent to the costs Tesoro incurs under the program. For the same four months, Tesoro's costs for the purchase of entitlements were $755,515, $523,310, $1,620,336 and $2,355,298, respectively. If Tesoro acquires working control of Commonwealth as a result of the Offer, any compensation which Tesoro agrees to pay to Commonwealth for benefits lost by Commonwealth under this program may result from negotiations other than at arm's length.

6. *Additional Financing.* On April 24, 1975, Tesoro received written commitments from two additional banks to lend to Tesoro $17,-500,000 under the credit agreement referred to in Section 7 of the Offer to Purchase. Consequently, the total amount available under such credit agreement for the purchase of Shares pursuant to the Offer is $85,000,000. No decision has been made by Tesoro as to whether such additional funds will be used to purchase any additional Shares in the event that substantially more than 5,500,000 Shares are tendered pursuant to the Offer. Tesoro is continuing discussions with other banks concerning possible additional financing.

7. *Request for List of Stockholders.* On April 23, 1975, Tesoro acquired as a contribution to its capital five Shares from Dr. Robert V. West, Jr., Chairman of the Board and Chief Executive Officer of Tesoro. Dr. West now owns 3,402 Shares. On April 23, 1975, Tesoro made a demand on the Company for the production of a list of stockholders for the purpose of, among other things, contacting stockholders of the Company with respect to the Offer. The Company has informed Tesoro that it will reply to such demand after it has determined the propriety thereof.

April 28, 1975

Tesoro Petroleum Corporation
8700 Tesoro Drive
San Antonio, Texas 78286

Any questions or requests for assistance may be directed to the Dealer Manager or to the Soliciting Agent at their respective telephone numbers and locations listed below. You may also contact your local broker, dealer, bank, trust company or nominee for assistance concerning the Offer.

The Dealer Manager:

**E. F. HUTTON & COMPANY INC.**
One Battery Park Plaza
New York, N. Y. 10004
(212) 742–5000 (Collect)

Depositary:

*By Hand or By Mail:*

Continental Illinois National Bank and Trust Company of Chicago
Corporate Securities Division—12th Floor
231 South LaSalle Street
Chicago, Illinois 60693

Forwarding Agent:

*By Hand or By Mail:*

United States Trust Company of New York
Corporate Trust and Agency Services—3rd Floor
130 John Street
New York, New York 10038

Soliciting Agent:

D. F. King & Co., Inc.

| 2 North Riverside Plaza | 20 Exchange Place | 555 California Street |
|---|---|---|
| Chicago, Illinois 60606 | New York, N. Y. 10005 | San Francisco, California 94104 |
| (312) 236–5881 | (212) 269–5550 | (415) 788–1119 |
| (Collect) | (Collect) | (Collect) |

Chas. P. Young Company/75 Varick Street/New York/212-431-5300

(3505)                                        Proof of April 29, 1975

## SUPPLEMENT AND EXTENSION

TO

## OFFER TO PURCHASE SHARES OF COMMON STOCK

OF

## COMMONWEALTH OIL REFINING COMPANY, INC.

For Cash at

$11.50 Net Per Share

THE OFFER EXPIRES ON MAY 6, 1975 AT 5:00 P.M.,
NEW YORK CITY TIME, UNLESS FURTHER EXTENDED

To the Holders of Common Stock
  of Commonwealth Oil Refining Company, Inc.:

1. *Litigation.* On April 23, 1975, Commonwealth Oil Refining Company, Inc., a Puerto Rico corporation (the "Company" or "Commonwealth"), instituted an action in the United States District Court for the Southern District of New York alleging violations by Tesoro Petroleum Corporation, a Delaware corporation ("Tesoro"), E. F. Hutton & Company Inc. and others of Sections 7, 9, 11, 13, 14 and 20 of the Securities Exchange Act of 1934 in connection with the Offer, and sought an injunction, damages and other appropriate relief. District Judge Cannella, after hearings held on April 24–26, 29, 1975, ordered Tesoro to extend, until the dates and times set forth in Sections 2 and 3 hereof, the expiration of the Offer and the right of the Company's stockholders to withdraw their Shares. In addition, Judge Cannella ordered that the information contained in paragraphs 4 and 5 hereof be included in a supplement to the Offer.

2. *Extension of Offer.* Tesoro has extended to 5:00 P.M., New York City time, on May 6, 1975, its offer to purchase, upon the terms and conditions set forth in the Offer to Purchase dated April 18, 1975, as supplemented through this Supplement and Extension dated April 29, 1975, and in the related Letter of Transmittal ("Offer"), up to 5,500,000 shares of Common Stock, par value $5.00 per share (the "Shares"), of the Company, at $11.50 per Share net to the seller in cash. *The Offer is not conditioned upon any minimum number of Shares being tendered.*

Tesoro will purchase any and all Shares which are duly tendered by 5:00 P.M., New York City time, on May 6, 1975, up to 5,500,000 Shares.

If more than 5,500,000 Shares are duly tendered by 5:00 P.M., New York City time, on May 6, 1975, Tesoro will purchase at least 5,500,000 Shares and Tesoro may elect to purchase all or any part of the Shares tendered in excess of 5,500,000 Shares. If more than 5,500,000 Shares are duly tendered by such time and if Tesoro elects to purchase less than all the Shares so tendered, all Shares purchased will be purchased on a pro rata basis, with appropriate adjustments to avoid the purchase of fractional Shares. If less than 5,500,000 Shares are duly tendered by 5:00 P.M., New York City time, on May 6, 1975, Tesoro will purchase all such Shares.

If Tesoro further extends the Offer, all Shares tendered during any extension which are purchased by Tesoro will be purchased on a first-come, first-served basis unless otherwise announced at the time of such extension.

Payment for all Shares duly tendered and purchased pursuant to the Offer will be made as soon as practicable after May 6, 1975. Certificates for any unpurchased Shares will be returned without expense to the tendering stockholders as soon as practicable after the expiration of the Offer. Tesoro will pay all stock transfer taxes, if any, on the purchase of Shares by it (see Instruction 5 to the Letter of Transmittal), as well as all charges and expenses of the Depositary and the Forwarding Agent.

3. *Withdrawal of Tender.* Stockholders who have previously tendered their Shares or who hereafter tender their Shares pursuant to the Offer may withdraw any or all Shares so tendered at any time prior to 5:00 P.M., New York City time, on May 6, 1975, or, if such Shares have not previously been purchased by Tesoro, at any time after June 15, 1975. To be effective, written or telegraphic notice of withdrawal must be timely received by the Depositary at its address set forth below. Such notice must specify the name of the tendering stockholder, the number of Shares to be withdrawn, the serial number of each deposited certificate evidencing the Shares to be withdrawn and the name in which each such certificate is registered if different from that of the tendering stockholder. All questions as to the validity (including time and receipt) of such notices will be determined by Tesoro, whose determination shall be final and binding. Any Shares withdrawn will be deemed not duly tendered for purposes of the Offer. Approximately 80,000 Shares have been deposited or guaranteed to be deposited at the date of this Supplement and Extension.

Except as otherwise stated in this Section, all tenders are irrevocable.

4. *Additional Information Regarding Puerto Rico Tax Exemption.* Commonwealth and its subsidiaries and affiliates are the holders of various tax exemptions granted by Puerto Rico under the Puerto Rico Industrial Incentive Act.

According to Commonwealth's Annual Report on Form 10–K for 1974, if the earnings of various subsidiaries and affiliates of Com-

monwealth had not been exempt from Puerto Rico income taxes an additional $29,220,501 in Puerto Rico incomes taxes would have been paid in 1974.

Under the Puerto Rico Industrial Incentive Act, the tax exemption of a corporation is subject to forfeiture if shares of the corporation's stock are transferred without the prior written approval of the Governor of Puerto Rico, except in certain specified cases. Tesoro has been advised by the Special Counsel to the Economic Development Administration of Puerto Rico that the acquisition of the Shares by Tesoro will not affect such tax exemptions. Final decision, however, rests in the Governor.

5. *Additional Information Regarding Possible Loss of FEA Entitlements.* As indicated in Commonwealth's Annual Report on Form 10–K for 1974 and in its 1974 Annual Report to Stockholders, Commonwealth receives substantial benefits under the crude oil cost equalization program adopted in November 1974 by the Federal Energy Administration. On the other hand, the program has increased the cost to Tesoro of the crude oil that Tesoro refines. As a result of the Offer, it is possible that the benefits received by Commonwealth under the program may be reduced and that the cost to Tesoro of the program may be reduced. In that event, Tesoro may be required to compensate Commonwealth for part or all of such benefits lost by Commonwealth. Because of uncertainties involved in the application of the program and because of possible changes in the program, Tesoro is unable to predict the effect of the Offer on Commonwealth's position under the program. It is possible, however, that the effect may be materially adverse. Attention is invited to the decision and order of the Federal Energy Administration in *Getty Oil Company (Eastern Operations), Inc., Skelly Oil Company, New York, New York* (2 FEA ¶ 83,041; decided February 12, 1975) which held that those two refiners, under common control, should be treated as separate firms for purposes of the crude oil cost equalization program. Counsel for Tesoro believes that, under this decision, Tesoro and Commonwealth would also be treated as separate firms for purposes of the crude oil cost equalization program and that, therefore, with respect to such program, the consummation of the Offer will not have a material adverse effect on Commonwealth.

In this connection, it should be noted that, Commonwealth has informed Tesoro that for the months of November and December, 1974, and January and February, 1975, this program resulted in benefits to Commonwealth from the sale of entitlements of $1,613,580, $4,859,825, $2,094,102 and $6,165,187, respectively. If Tesoro were deemed by the FEA as controlling Commonwealth, and as a single refiner with Commonwealth, Commonwealth believes that it could lose benefits at least equivalent to the costs Tesoro incurs under the program. For the same four months, Tesoro's costs for the purchase of entitlements were $755,515, $523,310, $1,620,336 and $2,355,298, respectively. If Tesoro acquires working control of Commonwealth

as a result of the Offer, any compensation which Tesoro agrees to pay to Commonwealth for benefits lost by Commonwealth under this program may result from negotiations other than at arm's length.

6. *Additional Financing.* On April 24, 1975, Tesoro received written commitments from two additional banks to lend to Tesoro $17,500,000 under the credit agreement referred to in Section 7 of the Offer to Purchase. Consequently, the total amount available under such credit agreement for the purchase of Shares pursuant to the Offer is $85,000,000. No decision has been made by Tesoro as to whether such additional funds will be used to purchase any additional Shares in the event that substantially more than 5,500,000 Shares are tendered pursuant to the Offer. Tesoro is continuing discussions with other banks concerning possible additional financing.

7. *Request for List of Stockholders.* On April 23, 1975, Tesoro acquired as a contribution to its capital five Shares from Dr. Robert V. West, Jr., Chairman of the Board and Chief Executive Officer of Tesoro. Dr. West now owns 3,402 Shares. On April 23, 1975, Tesoro made a demand on the Company for the production of a list of stockholders for the purpose of among other things, contacting stockholders of the Company with respect to the Offer. On April 28, 1975, District Judge Cannella, upon the application of Tesoro, ordered the Company to make available to Tesoro the most recent record of shareholders of the Company together with transfer sheets or other similar data sufficient to enable the shareholders of record of the Company as of April 28, 1975 to be determined.

April 29, 1975

> Tesoro Petroleum Corporation
> 8700 Tesoro Drive
> San Antonio, Texas 78286

Any questions or requests for assistance may be directed to the Dealer Manager or to the Soliciting Agent at their respective telephone numbers and locations listed below. You may also contact your local broker, dealer, bank, trust company or nominee for assistance concerning the Offer.

The Dealer Manager:

**E. F. HUTTON & COMPANY INC.**
One Battery Park Plaza
New York, N. Y. 10004
(212) 742–5000 (Collect)

Depositary:

*By Hand or By Mail:*

Continental Illinois National Bank and Trust Company of Chicago
Corporate Securities Division—12th Floor
231 South LaSalle Street
Chicago, Illinois 60693

Forwarding Agent:

*By Hand or By Mail:*

United States Trust Company of New York
Corporate Trust and Agency Services—3rd Floor
130 John Street
New York, New York 10038

Soliciting Agent:

**D. F. King & Co., Inc.**

| | | |
|---|---|---|
| 2 North Riverside Plaza | 20 Exchange Place | 555 California Street |
| Chicago, Illinois 60606 | New York, N. Y. 10005 | San Francisco, California 94104 |
| (312) 236–5881 | (212) 269–5550 | (415) 788–1119 |
| (Collect) | (Collect) | (Collect) |