OTIS ELEVATOR COMPANY,
Plaintiff,

v.

UNITED TECHNOLOGIES
CORPORATION,
Defendant.

No. 75 Civ. 5150.

United States District Court,
S. D. New York.

Oct. 29, 1975.

Stephen M. Axinn, Blaine V. Fogg, Stuart L. Shapiro, Edward J. Yodowitz, Skadden, Arps, Slate, Meagher & Flom, John S. Allee, Hughes, Hubbard & Reed, New York City, for plaintiff.

William B. Pennell, Thomas A. Dieterich, Robert Dobbin, Robert G. Dreffmer, Shearman & Sterling, New York City, for defendant.

PIERCE, District Judge.

## OPINION AND ORDER

On October 20, 1975, this Court signed an order directing the defendant, United Technologies Corporation ("United"), to show cause why a preliminary injunction should not issue against the furtherance of United's October 15, 1975 cash tender offer for not less than 2.5 and up to 4.5 million shares of the common stock of plaintiff Otis Elevator Company ("Otis"). The motion for an injunction, brought on by Otis on the basis of its first cause in an action commenced against United, charged that the outstanding tender offer was in violation of § 14(d) & (e) of the Williams Act. A hearing was scheduled for October 23, 1975.

On the morning of the hearing, United published in various newspapers a second Notice to Otis Shareholders, which No-

tice appeared to make certain changes in the tender offer which will be discussed hereafter. At the hearing, counsel for Otis lodged three additional charges against United on the basis of this second Notice. By the afternoon of October 23, 1975, the parties, at the request of the Court, entered into a stipulation whereby United agreed to extend the Expiration Date of its offer from October 27, 1975 to 10:00 a. m. New York City time on October 30, 1975. United further agreed not to take any steps in consummation of the tender offer until that time, and agreed to extend the pro-rata provisions and to preserve all rights of tendering shareholders in effect as of October 23, 1975 until October 30, 1975. The Court heard argument and received evidence relating to Otis' Williams Act charges on October 23rd and 24th.

On the morning of October 24, 1975, United published a third Notice to Otis Shareholders, which Notice reflected the terms of the stipulation and appeared to make still further changes in the offer.[1] During the two-day hearing, the Court received into evidence two depositions and forty-three exhibits presented by plaintiff. These documents, along with defendant's exhibits, the affidavits, and the transcript of the hearing, comprise the record in this matter. At the conclusion of the hearing the Court then reserved decision.[2]

The following shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Civ.P.

### The Parties and the Issues

Plaintiff Otis Elevator Company is a publicly-held company incorporated under the laws of the State of New Jersey; its principal executive offices are in the City of New York. The common stock of Otis is registered under the Securities

---

1. It is uncertain whether the United third Notice operated to revive shareholder withdrawal rights. See § 14(d)(5) of the Act; Transcript at 151–56.

2. The above chronology reflects the developments which occurred regarding the instant motion. Legal proceedings relative to this Offer were also commenced in the State of Indiana. However, on the 27th of October, 1975, the Court was informed that these proceedings had been dissolved.

Exchange Act (15 U.S.C. § 78*l*(b)), and is listed for trading on the New York Stock Exchange ("NYSE"). There are approximately 8,100,000 shares of Otis common issued and outstanding, held by approximately 24,000 owners of record. As revealed by its 1974 Annual Report, Otis has assets in excess of $700,000,000 and total revenues in excess of one billion dollars. A significant portion of its sales and operations are related to overseas ventures. Otis manufactures and services elevators and escalators.

Defendant United Technologies Corporation ("United"), until recently known as United Aircraft Corporation, is a publicly-held company incorporated under the laws of the State of Delaware; its principal executive offices are in Hartford, Connecticut. There are in excess of 11,880,000 shares of United outstanding, registered under the Exchange Act and listed for trading on the NYSE. According to United's 1974 Annual Report, United has assets in excess of 1.8 billion dollars and total revenues in excess of 3.3 billion dollars. United designs and manufactures a variety of products for aerospace, electrical and other industries.

The principal actors in this case related to these two corporations are as follows: Ralph A. Weller is Chairman of the Board of Directors of Otis Elevator Company; Harry J. Gray is Chairman of the Board, President, and Chief Executive Officer of United; Edward L. Hennessey, Jr., is United's Senior Vice President for Finance and Administration, and a member of the Board of Directors; Felix Rohatyn is a general partner of Lazard Frères & Co., an investment banking house, and dealer-manager for United's cash tender offer.

Pursuant to the provisions of Section 13(d) of the Williams Act, United filed a Schedule 13D statement with the Securities and Exchange Commission relative to the instant cash tender offer on October 14, 1975. Said filing occurred following a meeting of United's Board of Directors held that morning, at which meeting the tender offer was approved. On October 15, 1975, the offer appeared in the Wall Street Journal, the New York Times, and in a number of other publications across the United States. The offer was set to expire at 10:00 a. m., New York City time, on Monday, October 27, 1975, unless extended. The United offer provided that United would purchase an amount of shares up to 4,500,000 shares of Otis at $42.00 per share as long as at least 2,500,000 shares were tendered. United reserved to itself the option to purchase more than 4,500,000 shares if more than 4,500,000 were tendered. If Otis shareholders tendered, and United purchased, 4,500,000 shares, United would own approximately 55% of Otis, and thus achieve working control.

The United offer also provided that tendering shareholders would be allowed to withdraw shares up until October 22, 1975, at 10:00 a. m., New York time.[3] If shares remained tendered, but not purchased by United, a right of withdrawal would be revived after December 14, 1975. Further, the offer apparently stated that if United elected to purchase fewer than all of the shares tendered, such shares as would be purchased would be selected on a pro-rata basis.[4] Paragraph 12 of the offer set forth the purpose of the cash tender offer as follows:

12. *Purpose of Offer; Interest in Securities of the Company.* The purpose of the Offer is to acquire for United a substantial interest in the Company, possibly constituting control. Depending on the number of Shares purchased, United might seek representation on the Board of Directors of the Company which would put it in control of such Board of Directors.

Shortly before deciding to make this Offer United had preliminary discussions with the management of the Company with respect to the possibility of a merger or similar combination of the businesses of the Company and United. These discussions were termi-

---

3. See § 14(d)(5).

4. See § 14(d)(6)

nated when United was advised that the Board of Directors of the Company did not wish at that time to entertain a proposal by United with respect to such a combination. There is no agreement or understanding between United and the Company to the effect that any proposal will be made with respect to such a combination or that any such transaction will be consummated and *United has not formulated any plan or proposal to merge the Company with United* or with any other person or to cause the Company to sell its assets or liquidate or to make any other major change in the Company's business or corporate structure. United intends, however, if it purchases Shares pursuant to the Offer to continue to study the Company and its business and, if it determines that such a transaction is advisable, to propose the terms thereof to the Company and to seek to have the Company consummate such transaction. (Emphasis added.)

In support of its motion for a preliminary injunction, Otis initially pressed a number of charges, including claims (1) that the above-quoted paragraph 12 of the offer was false and misleading in that it failed to reveal that United did indeed have a plan to merge Otis into United, and was required to disclose the details of said plan via Schedule 13D [17 C.F.R. § 240.13d–101 (1975)]; (2) that United had manipulated the market in Otis shares on the eve of the tender offer by stating to a reporter for *Barron's* magazine that any rumor of intention by United to acquire Otis was "news" to United, an alleged violation of § 14(e);[5] (3) that Item 4 of the offer allowed United arbitrarily to accept or reject shares tendered by way of broker guarantees, thus allowing United to circum-

vent the pro-ration requirements of § 14(d)(6); (4) that United failed to reveal that it would purchase even if only 1.6 million shares were tendered, that true intent making the published minimum of 2.5 million a false and misleading statement in violation of § 14(e); (5) that United had failed to reveal that Felix Rohatyn of Lazard's had advised United that United would have to offer $45 to $50 in order to effect a merger with Otis; (6) that Item 7 of the offer, providing that broker-dealers would receive a 75¢ solicitation fee regardless of whether the shares tendered were actually solicited or merely tendered from the broker-dealer's own account, established an unlawful two-tier price structure; (7) that United had failed to reveal that its tender offer, if very successful, could result in delisting of Otis or refusal to list new Otis paper under NYSE policy;[6] and (8) that United had failed to reveal the antitrust implications of a combination with Otis.[7] All the above-said charges were detailed in the moving affidavit of Otis' counsel with affidavits of Otis officers submitted in support of the order to show cause.

After the Court signed the order to show cause on October 20, 1975, and after the expiration of shareholder withdrawal rights on October 22, 1975 (see Plaintiff Exhibit 1, ¶ 2), United, on October 23, 1975, published its second Notice to Shareholders. This Notice specifically stated that it "modified" the initial Offer. It made no provision for the reinstitution of withdrawal rights. The second Notice in effect dropped the minimum purchase level, stating that United would now purchase "ANY" shares duly tendered up to 4.5 million. The second Notice also apparently eliminated the challenged provision relating to the method of acceptance of broker guaran-

---

**5.** The fact that the statement was made by United personnel and the fact that it was published two days before the publication of the United tender offer, is undisputed.

**6.** See *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 255 (2d Cir. 1973).

**7.** No antitrust aspects of Otis's second cause of action in 75 Civ. 5150 (RLC) were involved on this motion. The parties did brief and argue, however, the question of whether the potential antitrust consequences of the acquisition should have been disclosed under the Williams Act, an issue the Court does not reach.

tees.   Apparently the second Notice further obligated United to purchase "ALL" shares up to 4.5 million and to pro-rate the purchases *if* more than 4.5 million shares were purchased.[8]

The second Notice did not address the issue of withdrawal rights, which had expired the previous day, October 22, 1975 as per the original tender offer.

At the hearing, counsel for plaintiff argued that the changes in the offer had been made in an attempt to forestall Otis' motion; counsel for United responded that United had the power to modify its offer, and that the changes had mooted many of plaintiff's claims. Plaintiff's counsel then made three new charges against United, asserting (9) that the new pro-rata provisions of the second Notice were defective;[9] (10) that United's statement regarding Indiana legal proceedings related to the tender offer was materially false and misleading; and (11) that the failure of United to reinstitute shareholder withdrawal rights upon such a significant change in its offer violated § 14(d)(6).[10]

It was in this context that the Court on October 23, 1975 requested that United extend its tender offer until 10:00 a. m., New York City time on October 30, 1975, or further and that the parties preserve the status quo.   The parties agreed upon the terms of an extension, and the following day, October 24, 1975, United published the third Notice to Otis shareholders embodying the terms of the stip-

ulation; this third Notice did not explicitly speak to reinstituting withdrawal rights; however, the Notice did employ the term "Shares which remain" duly tendered.[11]   Further, the third Notice committed United to pro-rate all shares purchased in the event United chose to accept less than all shares tendered.

In order to succeed on its motion, plaintiff must show a probability of success on the merits of at least one of its charges which the Court finds to be material.   After careful consideration, the Court has determined that plaintiff's charge that United possessed a merger plan within the meaning of what is required to be disclosed in Schedule 13D is a serious and substantial allegation.   The Court proceeds then on the premise that relief should be granted if plaintiff shows a probability of success on this claim alone and meets the Circuit's additional tests as discussed hereinbelow. See *General Host Corp. v. Triumph American, Inc.,* 359 F.Supp. 749, 753 (S.D.N.Y.1973).   Such an approach is warranted where, as here, the Court is confronted with a series of charges but has a record which is less than complete. See *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company,* 476 F.2d 687, 696–79 (2 Cir. 1973).   However, the Court will also consider the general condition of this tender offer in light of all the foregoing events.[12]

*The Applicable Standard*

█   It is clear in this Circuit that a preliminary injunction will issue against

---

**8.**   Plaintiff cites some support for the proposition that a material amendment to a tender offer should be accompanied by new withdrawal rights.   See *Sonesta, supra,* 483 F.2d at 255 (dicta).   However, in most cases where such rights have been extended or revived, it has been by virtue of explicit court order and in the context of a court-ordered amendment. See, e. g., *Commonwealth Oil Ref. Co. v. Tesoro Pet. Corp.,* 394 F.Supp. 267, 285 (S.D.N.Y. 1975) (Cannella, J.).   The power to order extensions of withdrawal rights was re-affirmed in *Corenco Corporation v. Schiavone & Sons, Inc.,* 488 F.2d 207, 211 (2d Cir. 1973).   However, this power on the part of district judges does not necessarily indicate that such an extension is required by law every time there is a material modification of an offer.

**9.**   See § 14(d)(6).

**10.**   See *Veeder Industries v. Western Pacific Industries,* 74 Civ. 4590 (S.D.N.Y. October 23, 1974) (Owen, J.).   But see note 8 supra.

**11.**   See Def. Exhibit V.

**12.**   In the Court's judgment, the general condition of the tender offer at this point is relevant primarily to the issue of the balance of the hardships and to the possibility of judge-ordered cure.   See *Butler Aviation International v. Comprehensive Designers, Inc.,* 425 F.2d 842, 845 (2d Cir. 1970).

the consummation of an ongoing tender offer "only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973); *accord, Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 866 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 692–93 (2d Cir. 1973).

In a somewhat different context, the Second Circuit recently has stated that the first prong of the "substantial questions" test is equal to "the presence of complex legal and factual issues." *Columbia Pictures Indus. v. ABC,* 501 F.2d 894, 897 (2d Cir. 1974).[13] As Judge Frank stated in the decision which was the origin of the *Sonesta* test, plaintiff must present "substantial, serious, difficult and doubtful" questions, so "as to make them a fair ground for litigation and thus for more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953).[14]

In this case, in light of the lighting legal maneuvers of both Otis and United, the Court considers it appropriate to apply a combination of both *Sonesta* tests.

█ Such an approach will serve to properly reflect the intent of the Congress in enacting the Williams Act. Congress clearly intended that the federal courts maintain a position of neutrality in the midst of tender offer battles.[15]

"The committee has taken extreme care to avoid tipping the balance either in favor of management or in favor of the person making the takeover bid. The bill is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case." (Report of the Senate Committee on Banking and Currency, S.Rep. No. 550, 90th Cong., 1st Sess. 3 (1967)).

The Second Circuit has repeatedly stressed this need for consideration of all the interests at stake. As Judge Friendly stated in *Butler Aviation International, Inc. v. Comprehensive Designers, Inc.,* 425 F.2d 842 (2d Cir. 1970):

"While courts should vigorously enforce the policy of honesty and fair dealing prescribed by federal securities legislation, they must guard against the risk that, at the instance of incumbent management, they may be frustrating informed shareholders from doing what the latter want." (*Id.* at 845, quoted in *Gulf & Western Industries, supra,* at 698 (Timbers, J.)).[16]

However, as Judge Timbers went on to say, this policy "clearly presupposes that the shareholders are indeed informed . . . ." *Gulf & Western, supra,* at 698.[17]

### Probable Success on the Merits
### Merger Plan

There can be little doubt that in September, 1975, Gray, Chairman of the Board and Hennessey, Senior Vice President of United were in possession of a plan to merge Otis into United long before the tender offer was made. However, the pertinent question is whether that plan survived the refusal by Otis on

---

13. *Columbia* was an action to enjoin a television broadcast on antitrust grounds.

14. *Benrus* affirmed the entry of an injunction against an acquisition of stock on antitrust grounds. *Id.* at 743.

15. See *Broder v. Dane,* 384 F.Supp. 1312, 1318 (S.D.N.Y.1974).

16. See also Bromberg, The Securities Law of Tender Offers, 15 N.Y.L.F. 459, 462–68 (1969) (interpreting legislative intent).

17. Accord, *Commonwealth Oil, supra,* 394 F.Supp. 267, 273 (S.D.N.Y.1975).

September 24, 1975 [18] to consider a friendly merger at the price offered by United's Gray and Hennessey. Plaintiff's counsel argues that this plan, reflected in a large number of documents prepared under the direction of United's Hennessey, was not substantially affected by Otis' refusal, but rather, that since early September, 1975, it was United's unswerving intention to achieve a plan of merger. Counsel for United stresses the refusal by Otis to accept friendly merger, and asserts that this refusal operated to cancel whatever plans United might have had. United argues that an inchoate plan is not material and need not be revealed, and asserts that without more a merger plan must be approved by resolution of the Board before it is disclosable under Item 4 of Schedule 13D. (Tr. at 147) [19] Otis urges that a merger plan may be inferred from the actions of United's top executive officers, and points to the fact, undisputed, that the Board of Directors of United had on the table before it financial data on Otis which included the so-called "40/30/30" merger plan. Both parties cite points and authorities, and the Court will discuss the applicable law in turn. However, it is first necessary to set forth the facts as the Court finds them. The following is based primarily upon United documents and the depositions of Gray and Hennessey, Directors and top officials of United.

Gray testified that he and Hennessey as a practice worked on acquisition plans without contact with the other members of the United Board, drawing upon Hennessey's staff for support. (Gray Depos. 55) Gray stated that United's interest in Otis Elevator had its origins in late August; on September 8, 1975, Felix Rohatyn, a partner of Lazard's, met with Gray and Hennessey, and suggested that United explore the possibility of a friendly merger with Otis. (Gray Depos.

at 66, 74, 83) The three traveled to New York by helicopter, and en route Gray examined papers for a "package plan" of merger which had been prepared by Hennessey's staff. (Plf.Ex. 14–18) [20] These documents, with titles such as "0–320 Merger and Acquisition Analysis" (Plf.Ex. 14) and "Basic Assumptions, UTC/0–320 Combinations" [21] sketched in considerable detail a "40/30/30" package plan. In the words of the Merger and Acquisition Analysis, the financial impact of an "association" with Otis "[a]ssumes a package offer of 40% cash, 30% UTC [United] common stock and 30% new UTC 7% convertible preferred stock for 0–320's common stock." (Plf.Ex. 14 at 7n.) As is abundantly clear from the repeated references to this plan, Hennessey's staff had constructed the entire merger plan with the underlying "basis assumption" that the package would involve two aspects: an initial cash tender offer for approximately 40% of Otis' common, followed at some later time by an exchange offer, (see Hennessey Depos. at 46 and Gray Depos. at 99), whereby United would exchange its own common stock for 30% of Otis' common, and would issue a convertible preferred in exchange for the remaining 30% of Otis. As Gray stated, his talks with Rohatyn were based on the idea that "we would try to get 40 per cent of the shares for cash, a certain percent in preferred stock and the remainder in common, and the thesis there was to try to find a package that would be attractive to all shareholders alike." (Gray Depos. at 99) Gray stated that he noted the tax-free advantages of the exchange part of such a package, and stressed in his deposition testimony that he, Hennessey and Rohatyn were considering only a friendly offer to merge, (Gray Depos. at 99), with the initial cash tender offer at $37 per share. (Gray Depos. at 100) This price of course assumed the approval of Otis management.

18. See Weller Affd. at 4.

19. "Tr." refers to the transcript of the hearing.

20. "Plf.Ex." refers to plaintiff's exhibits.

21. United informed the Court that "0–320" is United's code to signify Otis Elevator Company.

As regards financing the merger, Gray testified that was no problem; United had substantial funds available from operations and the ability to draw upon much more under existing bank arrangements. (Gray Depos. at 117–18) Further, United was ready to execute the transaction: "If the [Otis] management was willing, we could have done it instantaneously." (Gray Depos. at 118)

However, Otis was not receptive. According to Gray, Otis' Chairman of the Board, Weller, was not willing to talk price, although the parties did discuss merger. (Gray Depos. at 132) Subsequently, the Otis Board of Directors, on September 24, 1975, informed United that they did not want to entertain United's offer at that time. (Gray Affd. at 3; Weller Affd. at 4) That decision apparently followed a series of unsuccessful attempts by Rohatyn to bridge the price gap between the two corporations. (Weller Affd. at 2, 3) According to Weller, Rohatyn had offered as much as $42 per share on behalf of United, but Weller felt that an appropriate price for the first step of the merger would be between $45 and $50. (*Id.*) As far as the evidence before the Court indicates, it appears that at this point the flow of merger documents being produced by United's staff halted; documents (Plf.Ex. 42) which had been revised and updated to reflect the changing market conditions on almost a daily basis since early August apparently ceased their forward march. A number of these staff documents were updated on September 24, 1975 to reflect review on that date, but after September 25, 1975 apparently no new documents were drafted for over a week.[22]

On October 3, 1975, according to Gray, Rohatyn suggested that United consider making a tender offer for enough Otis shares to achieve representation on the Otis Board of Directors, perhaps in exchange for offering Otis seats on the Board of United. (Gray Depos. at 155–56)

On the same day, October 3, 1975, Hennessey, according to his own testimony, (Hennessey Depos. at 21; see also Murphy Affd.), told a United public relations man that any rumors about United negotiations with Otis to work a friendly combination were "news" to him. The statement, from United's second highest officer, found its way into print in the October 13, 1975 issue of *Barron's* magazine as follows:

> "*On the Margin*: Rumor of the week: United Technologies plans to acquire Otis Elevator. Answer of the week: 'It's news to us'—United Technologies."

The Court finds the foregoing events of October 3, 1975 and the fact of the publication of the *Barron's* item on the 13th of October, 1975, as facts for these preliminary purposes; and as a part of the sequence of events concerning the charge of a merger plan.[23]

On October 8, 1975, Gray and Hennessey agreed that the latter should begin to supervise the preparation of tender offer documents. (Gray Depos. at 154; Depos. of Hennessey at 30) Further, Gray testified that on that date he discussed with Rohatyn the "option" of a subsequent exchange offer. (Gray Depos. at 164) Further, Gray stated that he had a discussion with Hennessey to the effect that:

> "[A]fter we have achieved whatever percentage we decided to go in for a cash tender offer; we will then figure out what we have to do to get the rest of the shares in." (Gray Depos. at 166)

---

**22.** The Court has qualified its findings in regard to the flow of documents in Pfl.Ex. 42 because the record may be incomplete. See *Gulf & Western, supra,* at 696–97.

**23.** Thus, on the basis of this record, the Court does not consider plaintiff's problematic claim that the publication of this statement was in violation of § 14(e) and that it constituted market manipulation by United on the eve of the tender offer. However, the Court finds that the existence of this article is relevant to the investor hardship factor, *infra.*

Hennessey testified that one purpose of the cash tender offer was to preserve the option of a United merger with Otis. (Hennessey Depos. at 59)

On the eighth of October, the flow of United staff documents produced in this action began anew.[24] These documents (Plf.Ex. 42), dated October 8, 9, 10 and 13, 1975, detailed the same "40/30/30" package plan for a cash tender offer and an exchange offer as existed before September 24, 1975. While some of the documents addressed themselves solely to the issue of a cash tender offer, the great majority of documents which analyzed the long-term financial impact of the transaction on United spoke in terms of a cash tender and "then" an exchange offer involving United common and convertible preferred. The Court takes particular note of the fact that many of these studies were no more than updated versions of studies produced *before* September 24, 1975, the date of the refusal by Otis to entertain a friendly merger on the terms proposed.

Finally, on October 13, 1975, Hennessey's staff produced a flurry of documents which analyzed the breakdown of a "Package Offer for 0–320". Two of these documents analyzed the cost to United of the entire plan if the cash tender and the subsequent exchange offer was calculated at a price of $40 per share of Otis (Plf.Ex. 35 and 36) and two documents analyzed the cost of the entire plan if the cash tender offer and the subsequent exchange offer was calculated at a price of $45 per share of Otis. (Plf.Ex. 37 and 38) Each plan at each price was calculated for prospective purchase under the cash sequel of the offer of 2 million shares and of 3 million shares; where the purchase was at 3 million shares, the amount of shares to be purchased in the exchange segment of the offer was reduced accordingly.

The projected cost of the entire package to United was $327,438,120 if the price was $40 per share and $368,367,880 if the price was $45 per share.[25] According to Hennessey's testimony, he directed that these documents be prepared to determine the financial "impact to United" of the cash tender offer and the "impact to United in the future." Then Hennessey stated that "This was no more than a 'what if' ". (Hennessey Depos. at 68)

Hennessey then identified another document dated October 13, 1975:

> "Yes, this is still the merger proposal—Exhibit 39 is still the merger proposal, taking the latest prices of both UTC common and Otis common, the entire structure in merger, for total merger." (*Id.* at 71)

However, Hennessey stated that he did not discuss Exhibit 39 with anyone except the staff person who prepared it. (*Id.* at 73)

At 4:00 p. m. on October 13, 1975, the directors of United were polled to determine whether any of them had any transactions in Otis shares. This was the first indication to any of the directors, other than Gray and Hennessey, that United was interested in Otis. (*Id.* at 79)

In the interim, Hennessey had also been overseeing the preparation of tender offer documents. (*Id.* 30–32; 76–78) By the evening of the 13th of October, 1975, a final draft of the offering statement had been sent to the printer, to await only the name of the target company and the offering price.

When United's Board of Directors assembled on the morning of October 14, 1975, they were presented with a package of documents relative to the imminent cash tender offer for Otis shares. These included the Otis 1974 Annual Report (Plf.Ex. 8), an extensive and updat-

---

24. See note 22, *supra.*

25. United argues that there was no "package plan" on October 13, 1975 calculated at $42 per share. However, the Court notes that offering prices are often chosen at the last mo-

ment, as Hennessey's deposition indicates occurred in this offering. Hennessey Depos. at 92. Further, the Court again notes that the record may be incomplete; see *Gulf & Western, supra,* at 696–97.

ed study of Otis' business and the elevator-escalator market provided by two consulting firms (Plf.Exs. 10, 11, 12 & 13), three models for a cash tender offer at $40, $42 and $45 per share, analyzed for prospective purchases of both 2.5 million and 4.5 million shares, and a fifteen page document apparently entitled simply "0–320". This final document was the same document Gray had reviewed on September 11, 1975, plaintiff's Exhibit 14 discussed above, which was submitted to the Board of United, according to Mr. Gray, *sans* the title page which reads "0–320 Merger and Acquisition Analysis". (Gray Depos. at 176–77)

However, page 6 of Exhibit 14 contains a section entitled "Brief Analysis of Reasons for/against and Summary of Financial Impact of Merger or Acquisition." Further, page 7, dealing with financial impact, "Assumes a package offer of 40% cash, 30% UTC common stock and 30% new UTC 7% convertible preferred stock for 0–320's common stock." (Plf.Ex. 14)

It is undisputed between the parties that this document was before United's Board of Directors when it approved the instant cash tender offer. As counsel for United stated in open Court, the "information premising the 40–30–30 plan was before the Board because it contained all the financial data on Otis or a great deal of the financial data on Otis." [26]

It is Hennessey's testimony that there was no discussion among the Directors with regard to the contents of Exhibit 14, and that there was no discussion regarding any subsequent transaction to be had with Otis after the cash tender offer. (Hennessey Depos. at 104) Hennessey testified that the "40/30/30" package "didn't comply with the proposal we were making" and asserted that if

such a proposal was made, the Board would have to approve it at a subsequent date. (*Id.* at 106–07.) However, Hennessey stated that the Board was informed that there might be "a merger for the balance" of Otis shares. (*Id.* at 108.)

The United Board then received the final published Offer to Purchase, settled on the offering price, and approved the transaction. That Offer included the statement that "United has not formulated any plan or proposal to merge the Company with United . . . ."

■ The Court concludes, on the record and on the basis of the discussion that follows, that the above-quoted statement in paragraph 12 of the United Offer to Purchase was not only materially misleading, but that the statement was false.

*Discussion*

■ At the hearing on this motion, the parties addressed two legal questions concerning the "40/30/30" merger plan which the Court considers dispositive of the issues here. They are (1) whether the merger plan or plans were inchoate, and thus exempt from disclosure under Schedule 13D and (2) whether the plans are attributable to United as a corporate entity. It is agreed by both sides and clear to the Court that a merger plan, if present, is *per se* material under the Williams Act (Tr. 146).

Item 4 of Schedule 13D of the Williams Act, which applies to all tender offers, provides in pertinent part as follows:

"*Item 4. Purpose of transaction*

State the purpose or purposes of the purchase or proposed purchase of securities of the issuer. If the purpose or one of the purposes of the purchase or

---

26. Tr. at 149. United's counsel attaches importance to the date "September 3, 1975" appearing on Exhibit 14. However, in the Court's view, the fact that this document was presented to the United Board on October 14, 1975, at the time the Board approved the cash tender offer, and the fact that it was presented without alteration supports plaintiff's contention that the 40/30/30 plan did indeed survive the intervening refusal by Otis of United's merger overtures. In contrast, the studies by the two consulting firms were updated to October 10, 1975.

proposed purchase is to acquire control of the business of the issuer, describe any plans or proposals which the purchasers may have to liquidate the issuer, to sell its assets or to merge it with any other persons . . . ." (17 C.F.R. § 240.13d–101 (1975))

■ Schedule 13D, issued by the Securities and Exchange Commission pursuant to Section 13(d)(1)(C) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)(1)(C), has the force of law. In fact, Schedule 13D reflects the statutory language which refers to the reasons for such purchase. *Id.*

In 1967, members of the financial community strongly opposed the idea that the Williams Act was to require such disclosure. Lawyers argued that forcing an offeror to disclose such plans would result in premature and misleading disclosure, would deter offers, and would promote groundless litigation. See *Hearings on S. 510 before the Subcomm. on Securities of the Senate Comm. on Banking and Currency,* 90th Cong., 1st Sess. 126–50 (1967). As Professor Bromberg later wrote:

"Disclosure of plans and proposals was probably the most controversial part of the Williams Bill that passed, but it was diversely and severely opposed.

For Congress to reject this nearly unanimous criticism, and to depart from a strong tradition [of nondisclosure], it must have been deeply convinced of the importance of disclosing plans." (Bromberg, *The Securities Law of Tender Offers,* 15 N.Y.L.F. 462, 501 (1969) (footnote omitted).

The legislative intent seems clear; many of the arguments raised by United's counsel before this Court were considered and rejected by the Congress. Further, the Second Circuit has repeatedly enforced this "plans or proposals" requirement of the Williams Act, even when it was argued that such plans were to be executed only in the future. As Judge Mansfield wrote in *Sonesta International, supra:*

"To be material a statement in a tender offer need not necessarily relate to a past or existing condition or event. It may refer to a prospective event, even though the event may not occur, provided there appears to be a reasonable likelihood of its future occurrence. *Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Company, Inc.,* supra, 476 F.2d at 697; *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1298 (2d Cir. 1973)." (*Sonesta* at 251.)

There can be no doubt that the plan at issue here is the type of plan which, though prospective, is material under *Sonesta* and thus must be disclosed.[27] The documents discussed by the Court above clearly indicate that the "40/30/30" plan was highly developed and was ready for execution. While evidence which negatives is so often difficult to produce, the Court must nevertheless note that there is little or no documentary evidence that United intended to pursue solely the cash tender offer. As Hennessey testified:

"I don't believe that there is a specific piece of paper that puts forth the position of United if they didn't go forward with the merger." (Hennessey Depos. at 61)

As a Director, and the Senior Vice President of United for Finance and Administration, and as a member of the Executive Committee of the Board which was to oversee this cash tender offer, Hennessey was in a position to know exactly what plans United had for-

---

**27.** Defendant's counsel rely on *Susquehanna Corp. v. Pan American Sulfur Co.,* 423 F.2d 1075 (5th Cir. 1970), as support for their position that there was no merger plan. The situation in *Susquehanna* was, however, entirely different from that presented in this case. In *Susquehanna,* the court found that the plan had come into existence only after the initial tender had been made; there was no evidence whatsoever of its existence prior to that time. Further, the court there found that the plan "never got off the ground" and "subsisted for a mere few days" before it was repudiated. Id. In the present case, the plan had been in existence and has been continually updated over a period of three months.

mulated. (*Id.* at 6–7.) Indeed, the Court's own review of the documents in evidence supports Hennessey's conclusion; there appear to be no documents, staff, high level, or placed before the Board, which detail the financial impact and the investment posture of United in any *long-term* context that do not speak of an ultimate merger with Otis.

In *Sonesta, supra,* Judge Mansfield went on to write as follows:

"Where the event, if it should occur, could influence the stockholder's decision to tender, the chance that it might well occur is a factor that should be disclosed to the investor for consideration in making his or her decision." (*Sonesta, supra,* at 251.)

That the prospect of an executed merger plan could have influenced the tendering shareholder's decision here is beyond dispute. Gray, Chairman of the Board of United, testified that the whole purpose of the "40/30/30" plan was to "find a package that would be attractive to all shareholders alike." (Gray Depos. at 99) Indeed, given a choice, many shareholders, for tax or investment reasons, might have preferred to wait for the opportunity to tender their Otis shares in a prospective tax-free exchange for United common or United convertible preferred. These shareholders thus might have been provided with the option of receiving shares of United in addition to the option of receiving cash. However, the fact that such an alternative might become available was not disclosed to the shareholders. The statement in the Offer that United had not formulated any merger plans, together with the denial of any knowledge of any intentions of acquisition which appeared in the October 13, 1975 issue of *Barron's* clearly indicated to prospective tenderers that no merger plans existed. Therefore, shareholders were required to decide whether to tender or retain their shares without knowledge of any other alternatives.

■ The Second Circuit has often indicated that a plan or proposal will not be considered inchoate but rather, that the plan is material if there is strong evidence of its adoption by high corporate officers over a period of time. See *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1295 (2d Cir. 1973); *Electronic Speciality Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir. 1973) (requiring a "firm intention"); *Gulf & Western, supra,* at 696–97.

"Proof of such intent obviously is difficult, particularly where only limited discovery is possible, as in the case below due to the time limitations. Nevertheless, the [Chairman of the Board's] deposition, as well as other evidence adduced, strongly indicates that such intent was present." *Id.* at 696.

The recent decision of the Second Circuit in *Missouri Portland Cement Co. v. Cargill, Inc., supra,* is not inconsistent with this established rule, as counsel for United contends. In that case the tender offeror stated its intentions to control or possibly to merge, but stated that it had no plans to alter the business of the target corporation. 498 F.2d at 871. The target company charged that there *was* such a plan to alter its business and offered a report of a consultant to the offeror as evidence thereof. Judge Friendly found this evidence inadequate to demonstrate the requisite intent on the part of the offeror, where there was "no evidence that any such plan was developed, much less adopted . . . ." *Id.* at 872. In this case, the Court finds the merger plan to have been highly developed by United and clearly adopted by United's top management.

As Hennessey of United stated but a few days ago:

"My preference up until the 8th or 9th of October, whatever it might be, and even the 10th, perhaps was, yes, to go forward with a merger, a complete merger, on the 40 per cent cash or—30 and 30." (Hennessey Depos. at 125)

And Gray, Chairman of the Board of United, also stated in the midst of this litigation, that on October 8th, 1975, he had a discussion with Hennessey to the

effect that after the cash tender offer "we will then figure out what we have to do to get the rest of the shares in." (Gray Depos. at 166)

The Court considers these statements, and the others discussed above, to be material admissions of an intent on the part of United's two highest officers, an intent which is contrary to that evidenced by the Offer to Purchase. The only question which remains to be discussed is whether this intent can be properly attributed to the corporate entity, United Technologies Corporation.

As the Court has indicated, there is substantial deposition and documentary evidence relative to the Court's finding that United was preparing a plan of total merger with Otis. The Court has noted which of the documents were placed before the Board of Directors at its meeting on October 14, 1975, and it considers those documents and the timing of their presentation to the Board to be significant. However, before reviewing the events which occurred on the morning of October 14, 1975, it is appropriate to review the applicable law.

The Second Circuit has found sufficient evidence to impute intent to a tendering corporation under the Williams Act on the basis of the deposition of a Chief Executive Officer and other supporting documentary evidence. *Gulf & Western, supra,* at 696–97, and on documentary evidence not rising to the level of the plan present here. *Gerstle v. Gamble-Skogmo, supra,* at 1295–96.

Indeed, in one case in this Circuit, where a resolution of the Board of Directors was involved, a resolution of the Board directing the Chief Executive Officer *not* to pursue a plan of merger was considered sufficient to rebut the charge of merger intentions. *Electronic Speciality Co. v. International Controls Corp.,* 409 F.2d 937, 941 (2d Cir. 1973). In the latter case, Judge Friendly required a "firm intention" to pursue a merger. *Id.* at 948. Such an intention is believed by the Court to be present in this case. Gray, Chairman of United, and Hennessey, Senior Vice President, were the United officers charged with overseeing United's announced acquisition and expansion program. (Gray Depos. at 55; see Plf.Ex. 6 at 10) Gray is not only United's Chairman but is President and Chief Executive Officer. (Gray Depos. at 7) Hennessey is a member of the Board and the Executive Committee and Vice President in charge of Finance and Administration. (Hennessey Depos. at 3–4) Hennessey was also the officer in charge of the "0–320" acquisition program he had the power to contract with outside advisers for assistance on mergers without Gray's approval. (Gray Depos. at 77) It was Hennessey's duty to formulate acquisition plans and it was Gray's responsibility to present acquisition policy to the Board. (Hennessey Depos. at 117)

In the Court's judgment, this set of facts alone is sufficient to impute the merger plan to the corporation under the guidelines set forth in *Gulf & Western* and in *Gamble-Skogmo.* However, the Court need not stop at this juncture, for there is strong evidence that the "40/30/30" merger plan was in fact considered by the United Board of Directors on October 14th, 1975, when the cash tender offer was approved. The Court has reviewed the nature of the documents, *supra,* and concludes that it strains credulity to believe that the United Board did not realize that its officers had placed before it the first step in a two-step merger plan. In fact, Hennessey stated in his deposition that "both, merger and tender" proposals were presented to the Board by Gray. (Hennessey Depos. at 88) The nature of plaintiff's exhibits speak for themselves. The purported notes of the "minutes" of the Board meeting (Plf.Ex. 43) contain nothing more than a few markings on the pre-planned agenda; in fact they do not even reflect other significant action that Hennessey stated was taken by the Board, e. g., that the Executive Committee was not granted the power to amend the price of the offering. (Compare Plf.Ex. at 43 and Hennessey Depos. at 7–8)

Despite the fact that the Court cannot expect to have a totally complete record at this point; see *Gulf & Western, supra,* at 696–97, the Court finds sufficient credible evidence to hold that plaintiff Otis Elevator Company has shown a strong probability of success on the merits as to the claim that United in fact was in possession of a merger plan at the time in issue here and a strong probability of success on the claim that a severe and unlawful breach of the mandate of Schedule 13D, 17 C.F.R. § 240–13d–101 (1975) is therefore presented in this case.

### Balance of Hardships

The Court has concluded that plaintiff has shown a probability of success on the merits of its merger plan claim. It is now appropriate to consider the balance of hardships. As the decision of the Second Circuit in *Gulf & Western, supra,* instructs, the Court must balance and consider the interests of (1) the target company, Otis; (2) the tender offeror, United; and (3) the shareholders of the target company. 476 F.2d at 698. The Court will proceed in that fashion.

#### 1. *Otis Elevator Company*

Since the present motion does not involve the antitrust charges of Otis' second cause of action, and since the Court has not considered Otis' claim under the Williams Act that antitrust possibilities should have been disclosed, it would be inappropriate for the Court to consider the proposition advanced in a number of cases that consummation of the tender offer might entangle Otis in a antitrust violation. Compare, e. g., *Gulf & Western, supra,* at 698. It has been said that Courts should take with a grain of salt the claim of "jitters in executive suites". *Missouri Portland, supra,* at 869 n. 36.

While acknowledging the scant opportunity for the parties to present fully the evidence which they may have, thus far Otis has not presented evidence which leads the Court to conclude that the failure to grant the relief sought would result in any significant hardship to it. Consequently the conclusion must be drawn at this juncture that the plaintiff's hardships would be minimal if an injunction did not issue here.

#### 2. *United Technologies Corporation*

The Court is of the view that the interests of United are disposed of by the three principles discussed in *Gulf & Western.* First, United has no absolute right to proceed with a tender offer merely because it considers the time to be ripe and profitable. Second, the right to proceed can be urged only where a tender offer is lawful; the Court here has made a preliminary conclusion that this offer presents a grave violation of the Williams Act. Therefore, the Court regards the right of United to proceed with this offer to be minimal if not non-existent in view of the finding here that United has failed to disclose its merger plan. Third, unlike the case of an injunction entered on antitrust grounds, here the Williams Act claims lend themselves to ultimate resolution without the delays which necessarily accompany the disposition of an antitrust case with its attendant extended discovery and possibly lengthy trial on the merits.

#### 3. *The Interests of Shareholders*

The Williams Act was designed to protect investors; and therefore the interests of the investing public must be paramount. The Otis shareholder on October 15 was confronted with a published Offer which the Court has determined failed to disclose the material fact of United's merger plan and which falsely stated that United had formulated no plan or plans of merger. Further, the same shareholder, if he turned to the pages of *Barron's* magazine, was confronted with the statement that any plan of United to acquire Otis was "news" to United. A shareholder has a right to rely upon statements made by the tender offeror; full and adequate disclosure is what the Williams Act envisions.

Further, that same shareholder was confronted, the day after his withdrawal rights had expired, with a second Notice, which by its own terms "modified" the United Offer. Most importantly, no tendering shareholder knew of the fact that United was in possession of a plan to work a subsequent exchange offer for the balance of the Otis shares. Thus, the shareholder could not exercise the option of waiting for the prospect of a subsequent exchange offer.

The tender offer has already been extended at the Court's request. If this Court were to order corrective disclosure with still further extension, which it certainly has the power to do, the shareholder would be required to read four Notices to divine just what the Offer actually was. United has already "modified" its pro-rata provisions, the manner by which it handled methods of tender, and the minimum purchase line of its offer. Thus, it is clear to the Court that only an entirely new offering statement could cure the problems presented herein. In short, the Court concludes that the balance of hardships tips decidedly in favor of the shareholders and that they will be faced with irreparable harm if preliminary injunctive relief is not granted. As Judge Friendly stated in *Butler Aviation International v. Comprehensive Designers, Inc.*, 425 F.2d 842, 845 (2d Cir. 1970).

> "We cannot conscientiously allow [the offeror] to escape unscathed from the consequence[s] of inaccurate statements which it could easily have avoided and which may have had some tendency to affect the decision of [target] stockholders."

Thus, like the Court in *Butler Aviation*, this Court is faced with the choice between injunction and the opportunity for consummation. *Id.* at 845. While the election of the former is a difficult decision, to allow the latter would be to abdicate the role set forth for district courts in *Electronics Specialty, supra*, to employ the device of the preliminary injunction at the time when relief can best be given. 409 F.2d at 947. As Judge Friendly observed, "the opportunity for

doing equity is . . . considerably better . . . than it will be later on." *Electronics Specialty, supra*, at 947.

Accordingly, the motion of plaintiff Otis Elevator Company for a preliminary injunction restraining United Technologies Corporation from consummating its tender offer of October 15, 1975 is hereby granted.

Thus, it is hereby ordered that defendant United Technologies Corporation and all its agents, servants, employees and all others acting in concert with it or them is enjoined, pending the trial of this action, from: (a) taking any steps in furtherance of the tender offer for the shares of plaintiff heretofore made by defendant; and (b) consummating the tender offer.