**HANSON TRUST PLC, Plaintiff,**

v.

**SCM CORPORATION, Defendant.**

**No. 85 Civ. 6667 (RLC).**

United States District Court,
S.D. New York.

Sept. 14, 1985.

Weil, Gotshal & Manges by Dennis J. Block, Skadden, Arps, Slate, Meagher & Flom by Barry A. Garfinkel, New York City, for plaintiff.

Wachtell, Lipton, Rosen & Katz by Bernard W. Nussbaum, Robert B. Mazur, Eric M. Roth, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

SHIRLEY WOHL KRAM, District Judge.

The above-captioned matter is before this Court, sitting as the Part One Judge. Defendant SCM Corporation (hereinafter referred to as "SCM") has moved for a preliminary injunction. For the reasons which follow, the motion is GRANTED.

## BACKGROUND

Hanson Trust PLC (hereinafter referred to as "Hanson"), the plaintiff, and SCM have been engaged in a hostile tender offer battle. On August 21, 1985, Hanson announced that it would commence a cash tender offer for any and all of the outstanding shares of SCM's common stock. The offer would be for $60.00 per share.

On August 30, 1985, SCM and Merrill Lynch Capital Markets (hereinafter referred to as "Merrill Lynch") of Merrill Lynch, Pierce, Fenner and Smith announced that they had reached an agreement for a leveraged buyout of SCM. Pursuant to that agreement, Merrill Lynch would make a cash tender offer for approximately 85.7% of SCM's common stock at a price of $70.00 per share. At the back end of this transaction, the remaining SCM shares would be exchanged for subordinated debentures of the resulting corporation with a value of $70.00 per share. There were many other aspects to this agreement, but none are relevant to the instant application. In effect, SCM had found a "white knight" and the battle lines were drawn.

On September 5, 1985, Hanson increased its cash tender offer for any and all shares to $72.00 per share. Before 9:00 a.m. on September 11, 1985, a new merger agreement between SCM and Merrill Lynch was announced. This agreement provided for a leveraged buyout of SCM by Merrill Lynch and SCM management pursuant to a cash tender offer for approximately 80% of SCM's common stock. Once again, the back end of the transaction is to involve exchange of stock for paper—notes valued at $74.00. Merrill Lynch's tender offer is contingent upon its acquiring 66⅔% of SCM's common stock. The agreement also granted to Merrill Lynch options to buy two very valuable divisions of SCM should a third party acquire 33⅓% of SCM's common stock.

In response to the announcement of this "crown jewel" option and $74.00 per share offer, Hanson announced that it would terminate its tender offer. This announcement was publicly disseminated at 12:38 p.m. on September 11, 1985. Subsequent to this announcement, Hanson purchased approximately 25% of SCM's common

stock. These purchases all occurred between 3:00 p.m. and 4:34 p.m. in the afternoon of September 11, 1985. The shares were purchased in six privately negotiated transactions with sophisticated institutional investors and pursuant to a "cross" on the floor of the New York Stock Exchange. All of the purchases were pursuant to cash contracts at $73.50 per share. In a period of less than two hours during the afternoon of September 11, 1985, Hanson had purchased approximately 3.1 million shares of SCM's common stock at a cost in excess of $200 million in cash. It was these block cash open market transactions which once again thrust the battle into the courtroom in the early evening of September 11, 1985.

## PROCEDURAL HISTORY

At 8:42 p.m. on September 11, 1985, after having heard argument from counsel for both sides of this battle, this Court entered a temporary restraining order. This temporary restraining order restrained Hanson and its agents from acquiring any additional SCM common stock for twenty-four hours.[1] SCM argued that such an order was necessary because Hanson's open market purchases constituted a *de facto* tender offer which was designed to avoid the strictures of the Williams Act. SCM argued that it and its shareholders would be irreparably harmed if Hanson were not restrained because Hanson would acquire at least an additional 8⅓% of SCM stock the next morning. This act would defeat the Merrill Lynch tender offer, would violate the Williams Act, and would deprive the court of any opportunity to consider the legality of Hanson's conduct, according to SCM. The Court fully explained the basis for the entry of a TRO at the time it was entered.

On September 12, 1985, Hanson and SCM consented to extending the TRO until the conclusion of a hearing on September 13, 1985. Similarly, at the conclusion of a hearing on September 13, 1985, Hanson and SCM once again consented to an extension of the TRO until the Court could ren-

der its decision on the instant application for a preliminary injunction. The Court represented that it would render its decision by 4:00 p.m. on September 14, 1985, and accordingly, has done so.

## DISCUSSION

In order to obtain a preliminary injunction in this Circuit a party must meet the following standard:

> Preliminary injunctive relief in this Circuit calls for a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir.1979).

The Court concludes that SCM has met its burden as to irreparable harm. As the Second Circuit has said, in the tender offer context,

> preliminary injunctive relief is a particularly useful remedy for prevention of probable violations of the disclosure requirements of the Act.... (citation omitted) ... [O]nce the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to "unscramble the eggs."

*Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250 (2d Cir.1973).

SCM argues that it has no adequate remedy at law should it be determined at some future time that Hanson's open market purchases were made in violation of Section 14(d) of the Williams Act, 15 U.S.C. § 78n(d). The Court agrees that if Hanson is permitted to continue to purchase additional SCM common stock in the open market the Court could not, in reality, rescind the purchases at some future date after a full hearing on the merits. This is not a case where the Court could effectively "unscramble the eggs" and make SCM whole if it succeeds on its counterclaim.

---

**1.** On September 12, 1985 the Court modified the terms of the TRO.

More significantly, the Court finds that SCM shareholders will be irreparably harmed if Hanson is able to "block" the Merrill Lynch tender offer through purchases which the Court, at some future date, may determine violated the Williams Act. Only one legitimate tender offer is currently in existence. Should Hanson acquire in excess of 33⅓% of the outstanding shares of SCM, that offer would be defeated. A majority of the shareholders will, in that event, have been deprived of the opportunity to participate upon full notice, with all the other attendant rights guaranteed by the Williams Act, without adequate recourse at law. There would be no adequate remedy at law to "revive" the defeated Merrill Lynch tender offer or to allow the shareholders participation in the Hanson acquisitions. The Court concludes, therefore, that without a preliminary injunction in place SCM and SCM shareholders would be irreparably harmed.

■ To obtain the preliminary injunction it seeks, SCM must also meet the second prong of the test. For the reasons which follow, the Court concludes that SCM has demonstrated a likelihood of success on the merits of its counterclaim that Hanson's open market purchases, subsequent to its announcement that it had dropped its tender offer, were made in violation of Section 14(d) of the Williams Act.

The relevant underlying facts are not in dispute. On the morning of September 11, 1985, Merrill Lynch announced that it would increase its offer to $74.00 per share and that it had received a "crown-jewel" option to certain areas of SCM's business. Subsequent to this, Hanson announced that it was dropping its tender offer. After this announcement, and within a period of less than two hours, Hanson purchased 3.1 million shares in privately negotiated and open market transactions. Hanson purchased all of these shares for a price of $73.50 per share. All of these shares were acquired pursuant to cash contracts; that is, on or before the next business day, immediately upon presentation of the stock certificates pursuant to the oral agreement, Hanson's

investment banker, Rothschild, Inc., would pay for the certificates in cash. Thus, Hanson effectively spent well in excess of $200 million in cash in a period of less than two hours to acquire approximately twenty-five percent of SCM's common stock. This was done through six privately negotiated transactions and shares acquired pursuant to ancillary open market transactions.

The Williams Act does not define the term tender offer. The courts have used a variety of tests to determine when conduct is a tender offer. *See Wellman v. Dickinson*, 475 F.Supp. 783, 826 (S.D.N.Y.1979) (8 factor test), *aff'd*, 682 F.2d 355 (2d Cir. 1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *S–G Securities, Inc. v. Fuqua Inv. Co.*, 466 F.Supp. 1114 (D.Mass.1978) (2 factor test). Without deciding what test should ultimately be applied to determine whether Hanson's conduct constitutes a "tender offer" within the meaning of the Williams Act, the Court concludes that SCM has demonstrated a likelihood of success on the merits of its contention that Hanson has engaged in a tender offer which violates Section 14(d) of the Williams Act.

Based upon the undisputed facts SCM has demonstrated a likelihood of success on the merits for its contention that Hanson's purchases of stock, after its tender offer was dropped, was a deliberate attempt to do an "end run" around the requirements of the Williams Act. SCM contends that Hanson's conduct was a *de facto* tender offer for which no compliance with Section 14(d) has been established or even argued. There are many factors which compel that conclusion. These include the following. The time between the announcement purporting to terminate the tender offer and the first transaction was very brief: a period of two to three hours at the most. Moreover, all of the purchases, totalling 3.1 million shares, were made in a period of less than two hours. The volume of the acquisitions amounted to approximately 25% of SCM's common stock. All of these purchases were contracted for in cash. At

least one offer was turned down because the "cash" term could not be met by the seller. These cash contracts were to be settled *immediately* upon presentation of the stock certificates to Rothschild, Inc. There were no differences in price for the various transactions. Rather, there was clearly a single firm price of $73.50. Indeed, offers to sell for in excess of that price were routinely rejected. No real negotiation was engaged in. The testimony revealed that at no point did Hanson suggest a price other than $73.50. In fact, in at least one instance Hanson advised a potential seller of the price at which it had already effected transactions. Finally, the firm price Hanson maintained was approximately one point above the prevailing market price.

The parties have seriously contested whether Hanson decided to engage in open market purchases before it dropped its tender offer or after. While there is some evidence to suggest that Hanson had considered open market purchases before it announced that the tender offer was dropped, the fact that Hanson may have decided to violate the Williams Act after it announced it was dropping its tender offer would not preclude the issuance of the instant injunction.

The Court concludes that based on the foregoing discussion of undisputed facts, SCM has demonstrated a likelihood of success at a trial on the merits of its counter-claim that Hanson's conduct was a *de facto* tender offer in violation of Section 14(d) of the Williams Act.[2] Accordingly, SCM has met the standard necessary to obtain a preliminary injunction.

## CONCLUSION

SCM has met the necessary standard to obtain the preliminary injunction it seeks.

Accordingly, it is hereby

ORDERED that Hanson Trust PLC, HSCM Industries, Inc. and Hanson Holdings Netherlands B.V. and their officers, agents, servants, employees, and all persons in active concert or participation with them, are preliminarily enjoined from, directly or indirectly, acquiring or contracting to acquire any shares of SCM stock, and from exercising or attempting to exercise any of the voting rights inhering in the 3.1 million shares acquired by them pursuant to transactions commenced and/or consummated on September 11, 1985. This order shall remain in effect until a resolution of the claims raised herein by a full hearing on the merits or until further order of the Court.

SO ORDERED.

---

2. In granting the instant preliminary injunction, the Court relies primarily on "the likelihood of success on the merits" portion of the controlling standard. As for the alternative prong, the Court concludes that SCM has certainly raised a serious question going to the merits which is a fair ground for litigation. That question is whether Hanson's conduct in acquiring 3.1 million shares of SCM's common stock was a tender offer commenced in violation of Section 14(d) of the Williams Act.

As for the balance of hardships, while this issue is a much closer one, the Court nonetheless concludes that the hardships tip decidedly in favor of SCM and SCM shareholders. This is so because without the injunctive relief which is requested SCM shareholders may well be permanently deprived of the right to participate in the Merrill Lynch tender offer. In balancing the hardships it is appropriate for the Court to consider the interest of the shareholders. *Otis Elevator Co. v. United Technologies Corp.,* 405 F.Supp. 960, 973 (S.D.N.Y.1975). Likewise, because the Court feels it would not be possible to "unscramble the eggs" in the instant case, SCM would effectively lose the right to challenge the legality of Hanson's conduct without an injunction in place.

In view of the foregoing, the Court concludes that it would grant the instant preliminary injunction under this prong of the standard as well.